## HENDREY et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. April 4, 1916.)

No. 2546.

**1. POST OFFICE ☞35—USE OF MAILS TO DEFRAUD—CONSTRUCTION OF STATUTE.**

The use of the mails in carrying out a scheme to defraud may constitute an offense under Criminal Code (Act March 4, 1909, c. 321) § 215, 35 Stat. 1130 (Comp. St. 1913, § 10385), although the scheme in its inception had no relation to any law of the United States, but related to state laws only, and the use of the mails may have been unpremeditated, and merely incidental.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. ☞35.]

**2. POST OFFICE ☞48(4)—USE OF MAILS TO DEFRAUD—INDICTMENT.**

An indictment against nine defendants for having devised a scheme to defraud by the organization of six connected banks in four different states, which were without substantial capital and were kept in operation by transferring money or securities from one to another, and for using the mails in furtherance of such scheme, construed.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 72; Dec. Dig. ☞48(4).]

**3. CONSPIRACY ☞47—INDICTMENT—SUFFICIENCY OF EVIDENCE.**

A further count charging a conspiracy to use the mails in aid of a scheme to defraud construed, and on the only construction upon which it was sustainable *held* not supported by the evidence.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 105–107; Dec. Dig. ☞47.]

**4. POST OFFICE ☞49—PROSECUTION FOR USING MAILS TO DEFRAUD—EVIDENCE.**

On the trial of defendants, charged with using the mails in the execution of a scheme to defraud, the evidence to establish the existence of the scheme charged may be extensive in its scope, and must rest largely in the discretion of the trial judge.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ☞49.]

**5. POST OFFICE ☞49—PROSECUTION FOR USING MAILS TO DEFRAUD—EVIDENCE.**

Various rulings as to admissibility of evidence considered, in a criminal prosecution for using the mails to defraud against a number of defendants, who bore different relations to the matters in issue to which

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the evidence was directed, and *held* erroneous as to some of the defendants.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ☜49.]

6. CRIMINAL LAW ☜449(1)—OPINION EVIDENCE—SOLVENCY.
Where the question of the insolvency of a corporation at a given time is collaterally involved in a criminal prosecution, the opinion of a witness otherwise qualified, and who was in a position to know the facts, may be admissible on that issue.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1034, 1035; Dec. Dig. ☜449(1).]

7. COURTS ☜349—FEDERAL COURTS—FOLLOWING STATE PRACTICE.
The practice of the federal courts as to the scope allowed in cross-examination in criminal cases is not affected by the practice or rules of the courts of the state.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 925; Dec. Dig. ☜349.]

8. CRIMINAL LAW ☜881(2)—TRIAL—VERDICT—CONFORMITY TO INDICTMENT.
A defendant cannot be charged with one crime and convicted of another merely because the latter is developable out of the proof, which fails to establish the crime charged in the indictment.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2093; Dec. Dig. ☜881(2).]

9. CRIMINAL LAW ☜673(4)—TRIAL—INSTRUCTIONS.
Where, in a criminal prosecution against a number of defendants, evidence is received which is properly admissible against some of the defendants, but not against others, it is essential that the jury be expressly and carefully instructed in respect thereto.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1597, 1873; Dec. Dig. ☜673(4).]

10. CRIMINAL LAW ☜770(2)—INSTRUCTIONS.
While it is not error to refuse requested instructions in a criminal case which are clearly covered by the charge given, a defendant is entitled of right to have clearly stated to the jury each distinct and important theory of defense.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1806; Dec. Dig. ☜770(2).]

In Error to the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

E. L. Hendrey and others were convicted of offenses, and they bring error. Reversed, and new trial awarded.

Caruthers Ewing, of Memphis, Tenn. (E. G. McAdams, of Oklahoma City, Okl., and Ralph Davis, of Memphis, Tenn., of counsel), for plaintiffs in error.

Hubert F. Fisher, U. S. Atty., and W. D. Kyser, Asst. U. S. Atty., both of Memphis, Tenn.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. The four plaintiffs in error, Hendrey, Davis, Brooks and Wynne, were, jointly with five others, Cooke,

Toenges, Chick, Bonds and White, indicted in the court below, for violating section 215 (using mails to defraud, R. S. § 5480) and section 37 (conspiracy, R. S. § 5440), of the Criminal Code (Comp. St. 1913, § 10,201).[1] The first four counts alleged defendants' participation in a fraudulent banking scheme, and, in each count, a different letter or paper sent through the mails in furtherance of the scheme. The fifth count charged a conspiracy to violate the law by the same mailing which was the basis of the third count. The jury acquitted White on all counts. Toenges and Chick were generally acquitted by direction of the court, and Cooke escaped by a nolle pros. The jury found no one guilty under count 1, but convicted Hendrey under counts 2, 3, 4 and 5, and the other four respondents on counts 3, 4 and 5. The court arrested the verdicts of guilty on the second and third counts; Bonds absconded; and the four plaintiffs in error were sentenced each to three years' imprisonment on the fourth count, and to two years' additional imprisonment on the fifth count, and to pay fines of $1,000 each under each of these two counts.

This situation leaves for consideration only the fourth and fifth. The substantive offense now involved, and denounced by section 215, in its present form, is the depositing or causing to be deposited in the mails a letter or advertisement in execution or attempted execution of an existing scheme or artifice to defraud. The specific act, upon which the fourth count rests, is the mailing, at Memphis, of a copy of the Memphis Commercial Appeal, of July 1, 1911, addressed to J. E. Patterson, of Columbus, Miss., and containing the semiannual statement of the All Night and Day Bank of Memphis, as required by the banking laws of Tennessee (Shan. Code, pt. 1, tit. 14, c. 7).

For present purposes, we assume, and without intending to decide, that whoever publishes a bank statement in a newspaper may be thought to "cause to be placed" in the post office an "advertisement," if copies of that newspaper regularly go to subscribers through the mails. The course of the trial below indicates that defendants' counsel raised no such question, even if it does not show their practical concession that the crime could be so made out; we see no occasion to look into a question which has been given that aspect.

[1] We observe that most of the respondents' acts involved in the testimony and relied upon to prove a scheme to defraud were apparently violations of the banking laws of Tennessee and of the other states where the different banks were located, and that since the bank statement of the fourth count and the letters of the other counts were incidental to the ordinary or the required conduct of the banks, the practical effect of this situation is to call upon the laws or the courts of the United States to punish citizens of a state for violating laws of that state. The peculiarities of the present case make it a very extreme

---

[1] This case was tried in October, 1912, and, by consent of the then counsel for the United States the case was not perfected for hearing in this court by the printing of a brief for the United States until September, 1915. Examination of the 2,000 pages of typewritten record, accepted because of the poverty of plaintiffs in error, has been exceedingly tedious. These things both account for the long delay since the trial and make us less certain than usual that some minor error of fact may not appear in the opinion.

instance of such resort to the federal law; and yet, since the amendment to section 215, it is entirely clear that the scheme to defraud need have no original relation whatever to the laws of the United States, and that the mere incidental or unpremeditated use of the mails may give to the federal courts the trial of any state law offense which involves defrauding another person—this result being accomplished by the broad definitions of "defraud" and "scheme or artifice" which are now accepted. Bettman v. U. S., 224 Fed. 819, 140 C. C. A. 265; Tucker v. U. S., 224 Fed. 833, 140 C. C. A. 279. If it be true, as is sometimes thought, that there was no deliberate intent to extend so far the federal criminal jurisdiction, restriction can come only from Congress.

[2] Taking up the fourth count: This newspaper deposit in the mails is said to have been "for executing and effecting said scheme and artifice to defraud"; and so it must first be determined what is the "said" scheme or artifice to which this clause refers. This question is exceedingly difficult to answer. This count is reproduced in the margin [2] (including in brackets the matter also comprised in the fifth count).

A careful reading of the nearly 2,000 typewritten pages of the trial record discloses no clear and consistent theory as to the identity of the fraudulent scheme in connection with which the respondents were on trial; the proceedings during the two weeks of trial indicate fluctuating views as to what the real issue was; and so it becomes additionally necessary to find and identify this scheme in the indictment. This document covers three subjects: Recitals of the scheme, statements of what was done pursuant thereto and denials of the truth of the things assumed in the scheme. The first or main scheme recited seems to be: (1) To organize or otherwise gain control of six banks in four states, which banks (a) should not be financially responsible or able to do a legitimate banking business, (b) should be allied together under control of one or another respondent, and operated in the interest of each other by colorable, mutual transfer of securities, and (c) three of which should issue false and fraudulent certificates of deposit; and (2) to hold out all the banks as responsible and to solicit and receive deposits therein. The statement of acts done pursuant to the scheme recites the organization of seven banks (including the six first named), one or more of the defendants being connected with and in control of each bank, but there being no statement that all the defendants had to do with any one bank. By way of denial, the indictment then alleges that at the different times involved it was a fact, known to respondents, that these banks were not "bona fide, reliable, legitimate and financially responsible banks." It then returns to what is, in effect, though not in form, a further recital of the scheme, and says that, at the time of soliciting for the Memphis bank, the deposits of Patterson and the public, by the statement of July 7, 1911, it was intended by defendants fraudulently to convert such deposits to their own use. Obviously, there can be no complete scheme to defraud, unless some person or class is to be defrauded,

[2] See end of opinion.

and the only persons who could be defrauded by the organization and maintenance of a bank which was "not responsible and legitimate" would be those who bought its stock at a price which was too high, or became its creditors when it was (or became) insolvent. The relation between the depositors or other creditors of the Memphis bank and those of another bank—for example, the one at Kansas City—is not apparent. In what manner the maintenance of the Memphis bank as a going concern, when it should have been closed, and the receipt therein of deposits which it was a fraud upon depositors to accept, would defraud depositors in the Kansas City bank, is not revealed. So, only in the most indirect way, if at all, can it be said that mailing this statement to Patterson was "in the execution or attempted execution" of any fraudulent plan regarding the Kansas City bank, or the Oklahoma City bank, or the Little Rock bank, or the Trust Company of Hot Springs, or of Siloam Springs, or of Memphis; and since the fraudulent scheme described in the indictment must be that identical scheme in the execution of which the advertisement was mailed, we are persuaded toward the conclusion—even if not surely led thereto—that this prosecution must rest on such parts of the recited general scheme as were directed against the solvency and the good faith existence of the Memphis bank. Reference to other varying and fraudulent schemes, having to do with all the banks or having to do with the Memphis bank only, can be extracted from this indictment, but none of these schemes could be carried into execution or attempted to be—save in the most remote and consequential way—by mailing to Patterson the copy of the Memphis newspaper. The scheme or artifice in furtherance of which this semiannual statement was sent to him must have been something which could be furthered or which defendants thought could be furthered by such sending.

However, if it be assumed that a construction is possible which would make the broad, general, four-state scheme the one upon which the indictment depends, the prosecution is no better off. Upon that theory, it would not be supported by any evidence justifying conviction. Davis had no connection with the organization or management of any bank, excepting that at Oklahoma City; nor did Bonds with any excepting the one at Kansas City (and one of the small trust companies); while Hendrey, Brooks and several other respondents had to do only with the Memphis bank (and its subsidiary trust company). There is nothing distinctly and fairly tending to show that any two respondents participated in any scheme to organize or acquire or to control, in a fraudulent way, the seven banks named, or any two of the chief banks in the list. Association merely between one of the main banks and one of the trust companies falls so far short of the general, seven-member plan as to be an essentially different thing. The evidence is convincing that each man, Davis, Bonds and Hendrey, was primarily and substantially engaged in operating his own bank; that each was willing to get from the others favors for himself or for his bank; and that these favors were reciprocal; but this is its extent as to mutual relations, and it falls far short of showing the general scheme in question. That Davis persuaded, or even bribed (if he did), Bonds and Hendrey to take from him, for their banks, large amounts of paper

which turned out to be worthless, so wrecking their banks, tends to dispute rather than to support this theory of the indictment.

It does not follow that the prosecution must fail. The indictment does describe, in some of its portions, a subordinate or separable fraudulent scheme which the evidence did tend to support as to some respondents. Construing the indictment with liberality and with reluctance to hold that it furnishes no support for the judgment rendered, unless the record compels that conclusion, we are forced to conclude that the fraudulent scheme which, under the proofs, alone could coact with the act of mailing to create in the Western district of Tennessee, an offense against the federal law, and for which alone the respondents could lawfully be convicted on the trial and which alone we can rightfully consider the indictment as charging and the proofs as supporting, is a scheme by respondents to organize and maintain the Memphis bank and hold it out as entitled to public confidence and deposits, when, in fact, it had no substantial capital and was an empty shell, intending thereby to convert to their own use the money deposited. We can find no other scheme than this, the formation of which is fairly charged and supported by proof and to which the substantive act—the mailing of the statement—can possibly be pertinent.[3] Hence, in examining the errors alleged, we must regard this as the scheme involved, and we must consider that the respondents were not on trial for a scheme to encourage deposits in this bank by false representations in the semiannual statement[4] or a scheme to wreck the bank by unloading worthless paper upon it, or a scheme to injure the stockholders or the depositors of some other bank or any one of the other schemes at which the indictment hints. This same view was, at times, expressly taken on the trial, for we find the United States district attorney, in response to the court's question, "You are not trying these defendants for wrecking a bank?" answering, "No, your honor."

The fourth count is seriously defective in that it gave no information as to the proposed method or plan by which respondents were to convert the assets to their own use. They would have been entitled to a further statement of particulars; but only one of the convicted defendants, Davis, raised this point. The record shows that this was stated as one of the grounds of his demurrer to the indictment. What became of the demurrer does not appear. He seems, later, to have pleaded not guilty and he assigns no error on the overruling of this demurrer, if it was overruled. In view of the general conclusions we reach, the subject is not now important.

[3] The fifth count, that for conspiracy, and the conviction thereon, may well be considered before reviewing generally the trial pro-

[3] We lay to one side some casual references to respondents' plan to sell stock in these banks and convert the proceeds to their own use. It is clear that there is no intention to allege the stock-selling plan as the substantial fraudulent scheme, and that it is mentioned only collaterally; nor is it charged that the published and mailed advertisement could have been a step in the execution of such a plan; the proof does not indicate that any stock-selling plan remained in existence in July, 1911.

[4] The indictment alleged no particular in which the statement was untrue; yet the statement had evidential force as later pointed out.

ceedings. This count, also, we quote in the margin, omitting formal parts and matter repeated from count 4.[5] If this conspiracy count intelligibly charges any offense against federal law, it must be one based upon a scheme to defraud the St. Louis bank by means of the letter of April 28th. All the recited setting of the scheme, telling of the chain of banks and their inter-relation and their methods, gets nowhere as the statement of a scheme possibly effective to defraud the St. Louis bank or others like it. The St. Louis bank (unlike Patterson) was no part of the public which might deposit in the Memphis bank just because the latter was held out as real; the St. Louis bank could not be hurt, unless it was solicited to become a creditor of the Memphis bank. Hence the plan for such soliciting must have been an integral part of any scheme to defraud that (the St. Louis) bank. No plan for or advance intention of such soliciting, or any soliciting which this would typify, is alleged; but if we pass by that deficiency and take the allegation that the letter was sent as being a sufficient charge of the previous intent to send it, we find that the substance of the offense against the law which the parties conspired to commit was to send to the St. Louis bank this letter and get its money into the Memphis bank on the pretense of a good-faith loan to a responsible bank, when, in truth, the loan would be uncollectible, and when, in fact, the purpose of the respondents was to convert to their own use the money so secured. Viewing the count in this way—the only way in which it can be sustained as good—it is unsupported by any evidence. If the letter was what it purported to be—a request for a loan upon ample collateral tendered and enclosed therein—it would not seem to have been mailed "in the execution of" a scheme to defraud the lender. There is no proof even tending to show that ample collateral was not enclosed as stated. The entire record contains no reference to this subject, except the letter itself and the statement of the manager of the St. Louis bank that he declined the loan because he was not satisfied with the collateral. It is clear that a conviction of felony cannot rest on such a record, and on the record which is before us, a verdict for respondents, on this count, should have been instructed.[6]

We observe that this count seems to have been drawn according to a form in use before section 5480 of the Revised Statutes was changed to read as it now does in section 215 of the Criminal Code. The pleader evidently thought, as was not uncommonly thought of the old law, that the substantive crime was the formation of the scheme to defraud by use of the mails, and it seems clear that, considering this as the crime, he charged a conspiracy to commit that crime, and then set out the mailing of the letter merely as the necessary overt act to make the conspiracy punishable under R. S. § 5440 (Criminal Code,

---

[5] See end of opinion.

[6] We do not overlook the claim of the present counsel for the United States (not the district attorney who prepared the indictment and tried the case) that a part of this collateral consisted of the Williford notes, which were bad; but the record shows the inaccuracy of this claim, since the Williford paper had been given to the St. Louis bank as collateral to another loan which that bank had made a month before this letter of April 28th.

§ 37). Now, that it has become more commonly recognized under Criminal Code, § 215, that the crime consists of mailing the letter, and that, unless the letter is mailed, there is no offense, the query at once arises, how the actual commission of the crime can be the overt act which completes the conspiracy, unless the same act is made two crimes by different names, and so is to be twice punished? So, too, it is not clear, as above stated, that the indictment charges a conspiracy *to mail this letter,* or any other letter of this type; and there is no evidence tending to show the existence of any plan which would or might defraud the St. Louis bank in any other way than by this letter. The proofs indicate that Hendrey, seemingly in practice the sole manager of the Memphis bank, solicited this loan in the course of his conduct of the bank's daily affairs, and how the other respondents are thought to be sufficiently connected with this act, so that all can be charged with conspiring to do it, has not been pointed out. This is, obviously, a different question from the mere responsibility of conspiracy members for an overt act committed by one of them; this question pertains to the existence of the conspiracy. Indeed, the practice of joining a count for conspiracy with a count or counts against two or more persons for violating section 215, though common in some districts and though it has been judicially approved, does not seem to have been considered in the aspects that here arise, and will merit careful attention.[7] All these matters, it would be premature to determine at this time, without the benefit of consideration in the court below and of arguments by counsel.

We also observe, with reference to count five, that whatever conspiracy there was, to be accomplished by the letter of April 28, 1911, was finished or dropped on that day, while a large part of the proofs in the case is concerning acts committed and statements made after that date; and all this proof was not admissible under the fifth count, any more than under the fourth, as against respondents other than the one who acted or spoke.

[4] Errors were assigned on rulings upon evidence and on refusals of requests for a directed verdict and on refusals of requests to give special instructions. So far as these matters need consideration, they can be examined by groups. It is evident that with the con-

[7] The writer of this opinion notes that, ordinarily, there is no difficulty in conceiving the crime itself and the conspiracy to commit it, followed by some overt act, as two distinct offenses; but when we come to apply section 215 to the case of two or more respondents, and remember that a "scheme" planned by two or more people is a "conspiracy," we find, from one aspect, a conspiracy which is to be followed by a particular overt act, else the conspiracy is not wrongful; and we find, from the other aspect, the identical act pursuant to the identical conspiracy. Could joint respondents be acquitted for this act pursuant to this conspiracy, and then be subject to conviction for the same conspiracy materialized by the same act? The District Court met this difficulty by arresting judgment on the third count; but a doubt must arise whether Congress ever intended R. S. § 5440 (Criminal Code, § 37) to apply to a conspiracy to conspire, or to a conspiracy which was already specifically punished, if followed by a certain event, and which, unless to be followed by that very event, did not contemplate any offense against federal law. When and how far the crime of conspiracy survives the commission of the substantive crime is also suggested.

struction which we have put upon the indictment for fixing the identity of that scheme the existence of which was the preliminary issue to be tried, the scope of the evidence might be extensive. The existence of this chain of banks and their relations to each other in their mutual dealings, all of which formed merely the framework or setting of the effective scheme to be accomplished at Memphis, might, in some degree, be admissible, because these matters or many of them might tend to show the motives or characterize the general conduct of the respondents who were managing the Memphis bank. The limit to which such evidence may go must rest largely in the discretion of the trial judge, and the exercise of this discretion must be affected by the view taken, in a case like this, of the scheme or plan to defraud which is in issue. Certainly, less latitude will be permitted with reference to controversies which pertain to a matter which itself is only evidence tending to support the main issue than will be permitted as to controversies directly affecting the main issue. In this case, during a large part of the trial, it seems to have been thought that the scheme directly in issue involved the mismanagement or wrecking of the banks in Kansas City, Oklahoma City, Little Rock, and elsewhere, with which only Bonds only Davis or only Wynne had primary connection; although as we have pointed out, these things were no part of the scheme to defraud depositors in the Memphis bank, and the latter was the only scheme directly involved in the fourth count. Having this broader view of the indictment, it seems likely that the District Judge admitted evidence much more remote than he would otherwise have done; but in view of the necessity for a new trial otherwise developing, there is no occasion now to pass upon the assignments of error which rest only on this ground.

[5] The Memphis bank went into the hands of a receiver, August 9, 1911. Among its assets, and constituting more than half of its ostensible loans and discounts, were notes of, or indorsed by, I. N. Putnam, of Oklahoma City, amounting to about $50,000. $31,000 of these notes had been discounted at the Memphis bank, about March, 1911, and $16,000 in December, 1910, by respondent Davis, acting either for himself or for the Oklahoma Night and Day Bank of which he was, until January, 1911, president and manager. This Putnam paper, at the time of the trial of this case, was regarded as nearly, or quite, worthless, and the proofs were devoted largely to its history and character. There were two aspects, and two only, in which the value of this paper became material to the charge on trial under the fourth count, and the different respondents stand in more or less distinct relations thereto. If Hendrey received, personally, part of the Memphis bank's assets, exchanged for this Putnam paper at the time of its discount, and if he then was chargeable with knowledge that the paper was not good, this would tend to show his fraudulent conduct of the bank, leading up to and supporting the inference that he was, in June, 1911, fraudulently holding out the bank as entitled to confidence. As to respondents Wynne and Brooks, there is nothing to indicate that either of them profited personally by this discount. They were directors of the bank and they could turn the bank to their own profit only

as they were stockholders or became debtors, and from both of these points of view the discount of the Putnam paper, if it was bad, could not profit Wynne or Brooks, but could only injure them; so, it cannot be assumed that the discount was a step in any scheme by them to convert the bank's assets to their own use, nor can it be lightly assumed, without proof, that they would acquiesce in the injury which Hendrey would thereby do to them. The other aspect is that, if, at any time before June 30, 1911, Wynne or Brooks, or Hendrey was chargeable with knowledge that the Putnam paper was bad, this would tend to support the theory that each one having such knowledge would be guilty of fraud in continuing to participate in holding out the bank as responsible. The issue, as to the Putnam paper therefore, was, as to Hendrey, whether, and how far, he personally profited when he caused the Memphis bank to take the paper; as to Hendrey, Wynne and Brooks, whether the loss on this paper would make the bank insolvent, and, if so, whether each was, before June 30, 1911, chargeable with knowledge of this loss. Of course as to each defendant, the issue was, "Did he know, or, under familiar rules—stricter in criminal than in civil cases—must he be charged with knowing at the critical time?" and a good-faith belief by any defendant that the Putnam paper was good would fully justify any action which he took and which would have been rightful if the belief had been well founded, even although in fact the paper might have been wholly bad. A great deal of proof about Putnam and the Putnam paper seems to us to have been inadmissible as against any respondent, except Davis. No express notice of Putnam's condition or of the vast amount of his paper outstanding, is brought home to Hendrey, Wynne or Brooks. Putnam's credit seems to have begun to go down hill, some time in 1910, and to have then become a subject of controversy in Oklahoma, although, in 1909, he had been rated at $2,000,000. The paper was also criticized by state bank examiners, during 1910, in Oklahoma and in Missouri. The attacks on the paper were of such notoriety in these localities, and Hendrey's relations were such with the banks which had this paper in Oklahoma City, Kansas City and St. Louis, that the jury would be authorized to infer, if it saw fit, that Hendrey was put on notice as to the real value of the paper, and so was bound to satisfy the jury of his own good faith. We do not see any compelling reason for charging Wynne or Brooks with the same knowledge, or why they might not have been justified in believing what Hendrey may have told them. Wynne was, by occupation, a banker, at Little Rock, Ark.; Brooks, a lumberman, in Memphis. The mere fact, if it was a fact, that the Putnam paper was notoriously doubtful in the neighborhood of Oklahoma City or Kansas City would not charge Wynne or Brooks with any unusual degree of notice; and the whole matter of the reputation of the Putnam paper in Oklahoma would be admissible against Wynne and Brooks only contingently upon a finding that, by actual or implied notice, they would be bound to know it. The government was undertaking to prove two things: First, that the Putnam paper was bad in fact; and, second, the notoriety of that fact. As to the second, the evidence must be essentially hearsay, but as to the first, the ordinary rule applies requiring primary evidence. This distinction

seems to have been sometimes overlooked, as applied to the contents of books and documents.

[6, 7] The financial condition of the Memphis bank, at the time of its failure, was in issue. If it was solvent in the sense that it was able to pay its depositors and creditors, evidently, the scheme to defraud charged in the indictment was improbable. Mr. Taylor was a stockholder and had been one of the directors in the bank. He became its receiver and held that position for a short time only, until displaced by another receiver more acceptable to creditors. He was a witness in the case, and on cross-examination was asked to state his opinion as to whether it was insolvent. An objection by the district attorney to this question was sustained, and counsel avowed that the witness would have replied that it was solvent. We think respondents were entitled to this evidence, for whatever it might be worth, and that its exclusion was error. The ruling was based on the ground that the question called only for an opinion, and that the true way to show solvency or insolvency was to show all the liabilities and all the assets. This is theoretically true; where solvency is the main issue, as in bankruptcy, the theory can be approximately observed, although even there, opinion as to the value of the assets, must be continually involved and may be controlling; but where an issue of insolvency is collaterally involved along with a great many other things, it may be quite impracticable to do anything more than to take the conclusions of those who know the most about it, tested by such criteria as may be available. This case is full of statements made by witnesses who could have no absolute knowledge as to the solvency or insolvency of Putnam and several other makers of paper in the Memphis bank and of several other banks. The competency of witness Taylor to give a conclusion of any real value did not very satisfactorily appear; but no objection was made on this ground; the objection was put solely on the ground that no inference or conclusion could be received, and if the objection had been made that the witness was not qualified, it might perhaps, have been cured. So, also, it appears that the question was asked on cross-examination and was not germane to the examination in chief. It would have been proper to sustain the objection for that reason. We are told that, according to the Tennessee practice, a witness may be cross-examined on any matter material in the case; but state rules on this subject are not accepted by the federal courts, which are controlled by their own practice in this respect, and which do not permit cross-examination to go beyond the scope of the direct examination. McKnight v. U. S. (C. C. A. 6) 122 Fed. 926, 928, 61 C. C. A. 112. In this respect, also, if the objection has been made, it might have been cured by calling the witness for the respondents. Under these conditions, we probably would not reverse the case because of the exclusion of Taylor's testimony; but if the same question arises upon further trial, the court will have the benefit of the views which we have expressed.

Much of the testimony related to the issue of the so-called certificates of deposit by the Memphis bank. It issued interest-bearing certificates in the regular way and in rather small amounts to depositors, and these certificates were regularly entered on the bank

books. Hendrey also followed the practice of executing for the bank what appeared to be certificates of deposit and entrusting them to the nominal payee under an arrangement that the payee was to sell them and then deposit the proceeds in the bank as against the outstanding certificates. In other words, he used them like promissory notes. When the purposed use of them in this way fell through, they were returned to him or otherwise canceled, and, in these cases, no entry appeared on the bank books. The proof shows the execution and this incomplete delivery of $127,000 of such certificates, never entered on the bank books; but it shows that the great part, if not all, of such certificates were never completely delivered or ever presented as a claim against the bank. One of these transactions involved the use of such certificates by Davis for the alleged purpose of paying for stock he was buying in an insurance company, but no harm came of it to the Memphis bank, and if Davis' and Hendrey's theory of what was planned is true, none was intended. This course of business as to certificates was admissible as against Hendrey, and was sufficiently reckless and unusual, to say the least, so that it furnished some support to the charge that he was maintaining the bank as an instrument of fraud. We cannot see that the record brings any notice of any of these certificate transactions to Wynne, and they were not of such a character that notice could be presumed. Wynne's only connection with them was that, acting for his Little Rock bank, he bought $2,200 of certificates now said to be of this character. This action does not tend to show knowledge by him that the Memphis bank was hopelessly insolvent. Brooks seems to have participated in handling certificates of this class.

[8] We are compelled to think that, however many laws Davis may have broken in Oklahoma City with reference to the All Night and Day Bank of Oklahoma City, which closed June 9, 1911, and of which he was not president after January, 1911, there was nothing connecting him with the only scheme to defraud which was both charged in the fourth count of this indictment and supported by proofs. This was, as we have seen, a plan existing in June, 1911, to hold this Memphis bank out as solvent and responsible and thereby defraud the public which should deposit or loan. Davis was neither stockholder nor director in the Memphis bank; he had nothing to do with its management; and he touched its affairs from its birth to its death at only two or three points. The chief one is in relation to the Putnam paper. He and Hendrey shifted $50,000 of this paper from his shoulders or those of his bank to the Memphis bank. There was, doubtless, a personal profit in this paper for Davis, and, perhaps, as to a part or all of it, for Hendrey; and if, in truth, they took to themselves a large amount of the Memphis bank's good assets in exchange for paper which was worthless or partly so to their knowledge, this would be a scheme to defraud the bank and certainly its stockholders, and perhaps its depositors; but Davis was not on trial for anything like that; no such scheme is hinted at in the indictment; and it cannot be permitted that any respondent shall be charged with one crime and convicted of another merely because the latter is developable out of the proof which fails to show the crime charged. Nor can we possibly bring

Davis within the scheme which we have found to be the essence of the conviction, in the same way as those who were managing the bank may fall within it. Even if he had known that the Putnam paper was to be an absolute loss, and that its presence among the assets made the bank insolvent, it cannot be said that Davis mailed or caused to be mailed to Patterson the bank statement of June 30th; his connection with the Oklahoma bank had ceased six months before; he cannot be considered a participant in the making or publishing of the statement. We are satisfied that a verdict of acquittal should have been directed in favor of Davis on the fourth count as well as on the fifth.

[9] Errors are assigned because evidence was admitted concerning the statements or the acts of one respondent without instructing or cautioning the jury that such evidence would be of force only against that one respondent. The trial court evidently considered this whole matter as governed by that rule of evidence in conspiracy cases, which permits the acts or statements of one conspirator, made or done after the conspiracy has been formed and in the course of its execution and before it has been accomplished or abandoned, to be received as evidence against all. This rule seems to have been regarded as applicable to the trial of the counts under section 215 as well as of the conspiracy count. Some of the reasons which support this rule in a conspiracy case apply in a case where the offense on trial necessarily involves a precedent plan by two or more persons; others of the supporting reasons do not apply; it is not clear that respondents insisted on this distinction in the court below, and we need not determine the matter here. Assuming, for the purposes of this review, that the rule of evidence was the same under the other counts as under the conspiracy count, we find that a material part of the evidence so received referred to things said or done by some one respondent after the conspiracy of the fifth count had been completed or dropped on April 28, 1911, and after the offenses charged in the other four counts had been finished by the use of the mails in each count specified, viz., May 27, 1911, December 7, 1910, April 28, 1911, and July 1, 1911. Clearly, such evidence must be considered only as against the one respondent directly affected. Due protection of the rights of other respondents requires that the jury should be expressly cautioned to this effect, and warned that they must not consider the evidence as affecting other respondents, and that, if it is not practicable to give such caution every time that such evidence is received, it must, at least, be repeated frequently enough to be sure that the jury keep the rule in mind; and, in such a case as this, where most of the evidence pertained to respondents' acts that prima facie were individual rather than joint, it is almost if not quite essential that the final charge to the jury should carefully point out the conditions under which evidence of what one did or said may rightfully affect another's guilt. An analogous situation exists with reference to some evidence of acts while the conspiracy was in force. This must be received in a sense contingently, for it can ultimately be considered by the jury against other respondents only in case they conclude from all the evidence that the conspiracy did then exist; and the rights of other respondents can be preserved only by

the same careful, and, if necessary, repeated warnings and instruction to the jury.

The present counsel for the United States urge that, if there was any error upon this subject, it was cured; and say that, for example, while the post office inspectors were permitted to repeat, as witnesses, many statements which respondent Toenges made while in jail after the indictment was found, yet, that later in the trial, Toenges himself, as a witness, testified to these same facts, as to which his admissions had previously been received. With reference to Toenges, this claim is true as to some of the admissions, but not as to all; but with reference to several other witnesses, there can be no claim that whatever error there was in this respect was cured. For example, W. C. White was one of the respondents. On August 26, 1911, at a time later than the completion of either offense charged, and apparently after the collapse of at least part of the plans (for the letter refers to Hendrey's "second indictment"), White wrote a letter to Brooks. This letter referred to others of the respondents in very derogatory terms. When this letter was offered, and objection was made by other respondents that it was only a narrative made after the events mentioned in the indictment and must be limited alone to the writer, it was received, not only without caution to the jury, but with a ruling that it could be considered "as a circumstance throwing what light it may on the question whether there was a conspiracy to defraud and a scheme." The error involved in this view of the matter is emphasized by the fact that the jury acquitted White on all five counts, thereby establishing that he was not a co-conspirator.

[10] At the conclusion of the trial, respondents presented a considerable number of specific requests to charge, asking, among other things, that the jury be told that the respondents could not be convicted if all the testimony was as fairly consistent with their innocence as their guilt, and that they could not be convicted in the absence of an actual fraudulent intent, no matter how unsuccessful their banking schemes proved to be or how inconsistent with any sound judgment. These requests were refused, not because they were thought to be incorrect statements of the law (see Harrison v. U. S. [C. C. A. 6] 200 Fed. 662, 664, 119 C. C. A. 78), but because the subjects seemed to be sufficiently covered by the general charge. A reference to the latter shows that neither one of these subjects is covered, except by the instruction that guilt must be proved beyond a reasonable doubt, and by the repeated use of the word "fraudulent" in defining the conduct of respondents which would make it criminal. We have often approved the practice of declining to give instructions which, though proper in themselves, would constitute mere repetitions, usually in less intelligible form, of subject-matter consecutively and logically treated in the general charge but the respondents in a criminal case, no less than the parties in a civil case, are entitled of right to have clearly stated to the jury each distinct and important theory of defense, so that the jury may understand that theory and the essential rules applicable to it. We cannot avoid the conviction that the respondents' rights in these respects in this case were not sufficiently saved by the general charge.

Several of defendants' requests, including, especially, Nos. 1, 2, 7 and 19, should have been given, except that the rule of reconciling with innocence should be stated as above.

We have given serious consideration to the question whether the conviction of Hendrey should not be affirmed, and because his guilt under the fourth count is clear enough upon the undisputed testimony to make these errors nonprejudicial. It seems to appear that it was the fact, fully known to him, that out of the stated $40,000 capital and surplus paid in, shown in the statement of June 30th, less than one-fourth had ever been paid in in cash, in the ordinary way, so as to have been actually available for the bank's needs. The remainder was paid in, either by discounting in the bank notes signed or indorsed by subscribers or else through money borrowed by subscribers from other banks upon agreements that the money loaned should remain in those other banks to the credit of the Memphis bank and should not be drawn against. These agreements were doubtless invalid, as against the Memphis bank, but they indicated that the money was not in good faith available for the needs of that bank. So, as we go through the entire evidence, rejecting all parts which can rightly be criticized, there is no escape from the strong impression that Hendrey, on June 30th, must have known that the bank could not survive much longer, unless by a miracle, and that, in all probability, it could not pay existing depositors in full; yet, in spite of all these things, it cannot be said, as matter of law, that Hendrey's conduct is not fairly reconcilable with a good-faith belief on his part, on June 30th, that the Putnam paper would turn out to be good or that there would not be loss enough on that and other doubtful assets to make the bank insolvent. His good-faith belief on the one hand or his intent to defraud on the other hand constituted the controlling question as to him, and upon that he was and is entitled to the verdict of a jury, under instructions carefully preserving his rights and after a trial confined to evidence which fixed rules permit. We cannot be sure that, with those instructions and with only that evidence, the jury would have found his guilt to exist beyond a reasonable doubt.

As to respondents Wynne and Brooks, we are not prepared to say that they were entitled to an instructed verdict. There is little—perhaps nothing beyond suspicion from the company he kept—tending to connect Wynne with any scheme to convert the assets of the Memphis bank to his own use, or to permit other respondents to do so. Neither he nor his institution, the Little Rock bank, was a borrower from the Memphis bank. His main interest was, seemingly, the other way, as a stockholder in the Memphis bank, and as a creditor of Hendrey on the security of Hendrey's stock. As to Brooks, it seems that he or his company, the Continental Lumber Company, was a borrower in comparatively large sums from the bank, although the final state of the account is not clear; and his relations to Hendrey's plans seem to have been close. Both Wynne and Brooks were directors, and, as such, carried certain obligations. Whether each was bound to know and did know the condition of the bank and its assets so as to make him, on that ground, guilty of fraud in continuing to hold it out as a responsible institution, was an issue, which, while we

think it was the vital one in the case under the indictment, was not distinctly or fully tried out or submitted to the jury, and we prefer not to discuss it further.

Other errors are assigned which we think unnecessary to consider. Some of them, already discussed, were not properly saved; but others were, and we have desired to avoid leaving undecided questions likely to arise upon a new trial.

For the reasons stated, the judgment must be reversed and a new trial awarded. We cannot assume that the evidence upon the second trial may not be so materially different as to require the question of Davis' guilt to be submitted to the jury, and as to put a different light upon the fifth count.

### Certain Counts of the Indictment.

Fourth Count (Cr. Code, § 215).

And the grand jurors aforesaid upon their oaths aforesaid, do further present that, E. L. Hendrey, A. C. Cooke, George E. Toenges, H. C. Wynne, J. S. Chick, J. H. Brooks, C. A. Bonds, W. C. White and Abner Davis, whose Christian names are to the grand jurors unknown, yeoman, (sic) late of the circuit and district aforesaid, heretofore, before the finding of this indictment, on, to wit, the 21st day of April, A. D. 1910, at Memphis, in the county of Shelby, in the state of Tennessee in the circuit and Western division of the district aforesaid, and within the jurisdiction of this court, did unlawfully, willfully, fraudulently, and feloniously devise an intent to devise a scheme and artifice to defraud J. B. Patterson, of Columbus, Mississippi, and divers other persons to the grand jurors unknown, out of their moneys; which said scheme and artifice to defraud, the said Hendrey * * * did intend to execute and effect and attempt to execute and effect by use of the mails and the post office establishment of the United States, and in furtherance of said scheme and artifice to defraud, and in and for executing and effecting, and attempting to execute the same, the said defendants did deposit and cause to be deposited in the mails of the United States for mailing and delivery by the mails and the post office establishment of the United States, divers letters, packets, printed and published statements and representations; the said scheme and artifice to defraud was in substance as follows, to wit: [That the said Hendrey * * * would organize, incorporate and gain control of several banks in the states of Tennessee, Arkansas, Missouri and Oklahoma, to wit: All Night and Day Bank of Memphis, Tennessee; All Night and Day Bank of Kansas City, Missouri; the Night and Day Bank of Little Rock, Arkansas; the Night and Day Bank of Oklahoma; Ozark Trust Company, Siloam Springs, Arkansas; and the American Trust Company, of Memphis, Tennessee—none of which said banks would be reliable, responsible and financially, able to do a legitimate banking business and that each of said banks would be in practical control of one or more of said defendants, all of whom were friends and allied together and intended to and did operate said banks and the funds and credits of each, for and in the interest, of each other, and intended to and did switch and "kite" the funds and securities belonging to and in one of said banks to another thereof, and from that other of said banks to still another, or others, and so on through and among the entire chain of banks controlled and operated by said defendants, and that the All Night and Day Bank of Memphis, Tennessee would issue and use false and fraudulent certificates of deposit for the purpose of securing funds and stock in others of said string of banks, and for fraudulently procuring money for said All Night and Day Bank, and the officers thereof, and that the All Night and Day Bank of Little Rock Arkansas, and the American Trust Company of Memphis, Tennessee, would also issue and use false and fraudulent certificates of deposit for a like purpose; that in pursuance of said scheme and plan Hendrey * * * organized and incorporated the All Night and Day Bank of Memphis, Tennessee, on April 21st, 1910, with an authorized capital stock of fifty thousand ($50,000) dollars, with

E. L. Hendrey as president, A. C. Cooke, cashier, until June 30th, A. D. 1911, when he was succeeded by George F. Toenges, and each of whom was a director in said bank, and H. C. Wynne and J. S. Chick and J. H. Brooks, were also directors in same. Said bank proposed to do a general banking business and to be a reliable and financially responsible banking institution and to solicit, accept and receive deposits from individuals, firms and corporations; that the stock of said bank had a par value of one hundred ($100) dollars per share and was sold at one hundred and twenty-five ($125) dollars per share, and that defendants would collect of and from outside stockholders one hundred and twenty-five ($125) dollars per share for stock sold to them and that the defendants would make no bona fide payment whatever for stock issued to themselves.

That there was also established the Night and Day Bank of Kansas City, Missouri, with C. A. Bonds as president, and in charge and control thereof, and the said bank was allied with the All Night and Day Bank of Memphis, Tennessee. There was also organized the Night and Day Bank of Little Rock, Arkansas, with H. C. Wynne as president, and in charge and control thereof; there was also organized the Night and Day Bank of Oklahoma City, Oklahoma, with Abner Davis, as president, in charge and control thereof; there was also organized the Union Trust Company, of Hot Springs, Arkansas, with J. M. McDonald, as president, and also a director in charge and control of same, and with O. E. Helton, E. L. Hendrey, W. C. White and J. H. Brooks as directors; there was also organized the Ozark Trust Company, of Siloam Springs, Arkansas, with C. A. Bonds as president, and in charge and control thereof; there was also organized the American Trust Company, of Memphis, Tennessee, with J. M. McDonald, as president, O. E. Helton, as secretary and E. L. Hendrey, as director—all of which said above-named banks were closely allied and associated and their controlling officers and directors therein were all friends and associated in said plan and scheme; and each and all of said banks, and the said above-named defendants as officers and directors therein, would hold said banks out to be, and represent themselves to be liable, responsible banking institutions, and would solicit and accept and receive deposits from individuals, firms, and corporations, which said deposits were to be held in said banks subject to the check of the depositors thereof.

Whereas, in truth and in fact, at the time said scheme and artifice to defraud the said J. B. Patterson, of Columbus, Mississippi, and the divers other persons to the grand jurors unknown, was so devised by the defendants as aforesaid, and at the time the said All Night and Day Bank of Memphis, Tennessee, was organized and incorporated as aforesaid, and at the time said false representations and pretenses were made by defendants as aforesaid, and at the time deposits were solicited, accepted and received by said bank as aforesaid, as defendants then and there well knew, the said All Night and Day Bank of Memphis, Tennessee, was not a bona fide, legitimate, reliable and responsible bank and banking company, and at the time the said false representations and pretenses were so made to said J. B. Patterson of Columbus, Mississippi, and the divers other persons to the grand jurors unknown as aforesaid, the said defendants also well knew that the All Night and Day Bank of Kansas City, Missouri, the Night and Day Bank of Oklahoma City, Oklahoma, the Night and Day Bank of Little Rock, Arkansas, the Union Trust Company of Hot Springs, Arkansas, the Ozark Trust Company of Siloam Springs, Arkansas, and the American Trust Company of Memphis, Tennessee, were not bona fide, reliable, legitimate and financially responsible banks and banking institutions. But that said Hendrey, * * * at the time said scheme and artifice to defraud was so devised by them as aforesaid, and at the time said representations and false pretenses were made to said J. B. Patterson of Columbus, Mississippi, and to the divers other persons to the grand jurors unknown, did intend to solicit, receive and accept from the said J. B. Patterson of Columbus, Mississippi, and the divers other persons to the grand jurors unknown, their deposits into the said All Night and Day Bank of Memphis, Tennessee, and into the other banks hereinbefore mentioned, and to unlawfully, knowingly and fraudulently convert the money so received by them to their own use and benefit, and did, at the time said scheme and artifice to defraud

was so devised by them, intend to sell the shares of capital stock of said All Night and Day Bank of Memphis, Tennessee, and each of said other banks hereinbefore mentioned, to divers persons to the grand jurors unknown, and to the public generally, and to unlawfully, fraudulently and knowingly convert the money so received by them for said stock to their own use and benefit.]

And in pursuance of and in and for executing and effecting said scheme and artifice to defraud the said J. B. Patterson of Columbus, Mississippi, and divers other persons to the grand jurors unknown, the said Hendrey, * * * heretofore, before the finding of this indictment, on, to wit, the first day of July, 1911, in the circuit and Western division of the district aforesaid, to wit, in Memphis, in the county of Shelby, in the state of Tennessee, and within the jurisdiction of this court, did knowingly, unlawfully, fraudulently and feloniously deposit and cause to be deposited in the mails and the post office of the United States, at Memphis, Tennessee, aforesaid, for mailing and delivery by and through the mails and the post office establishment of the United States, a certain false, fraudulent and misleading statement, which said statement was published in the Commercial Appeal, a newspaper published in Memphis, Tennessee, which said statement appearing upon the twelfth page of the issue of Saturday morning, July 1, A. D. 1911, was as follows, to wit:

"Statement of the All Night and Day Bank.

"At the Close of Business June 30, 1911.

"Resources.

| | |
|---|---|
| Loans and discounts | $ 99,134 92 |
| Overdrafts | 293 70 |
| Furniture and fixtures | 12,877 85 |
| Expenses | 14,128 58 |
| Cash and due from banks | 27,411 85 |
| Total | $153,846 90 |

"Liabilities.

| | |
|---|---|
| Capital stock | $ 32,250 00 |
| Surplus and profits | 15,566 49 |
| Deposits | 96,030 41 |
| Bills payable | 10,000 00 |
| Total | $153,846 90 |

"I, A. C. Cooke, cashier of the above named All Night and Day Bank, do solemnly swear that the above statement is true, to the best of my knowledge and belief. J. Messick Hall, Notary Public.

"Officers.

"E. L. Hendrey, President; Wm. V. Taylor, Vice President;
"A. C. Cooke, Cashier.

"Directors.

"I. F. Peters, J. S. Chick, H. C. Wynne, A. C. Cooke, J. H. Brooks, J. A. Johnson, A. D. Gibson, E. L. Brooks, E. L. Hendrey, Wm. V. Taylor."

Contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States.

Fifth Count:

And the grand jurors aforesaid, upon their oaths aforesaid, do further present that the said * * * on, to wit, the 21st day of April, A. D. 1910, at Memphis, in the county of Shelby, in the state of Tennessee, in the circuit and Western division of the district aforesaid, and within the jurisdiction of this court, did unlawfully, willfully, knowingly and fraudulently and feloniously agree and conspire together to commit an offense against the United States, to wit, the offense of knowingly, unlawfully, fraudulently and feloniously devising and intending to devise a scheme and artifice to defraud the Night and Day Bank of St. Louis, Missouri, and divers other persons to the grand jurors unknown, out of their moneys, which said scheme and artifice to defraud was to be effected and executed by the use of the mails and the post office establish-

ment of the United States, and the said defendants did agree and conspire together that in furtherance of said scheme and artifice to defraud and in and for attempting to execute and effect the same, that they would deposit and cause to be deposited in the mails of the United States, for mailing and delivery by and through the mails and the post office establishment of the United States, divers and sundry letters, packets, written and printed statements and representations; the said scheme and artifice which the said defendants agreed and conspired to devise and which they were to execute and effect by and through the mails of the United States, was in substance as follows, to wit: \* \* \* (Here follows all which is in brackets in count 4, save that "Night and Day Bank of St. Louis" is substituted for "J. B. Patterson" wherever the latter name occurs.)

And in pursuance of said agreement and conspiracy and in and for executing and attempting to execute said scheme and artifice to defraud, and in execution of said conspiracy and in furtherance of, and in and for executing and effecting and attempting to execute and effect, said scheme and artifice to defraud the Night and Day Bank of St. Louis, Missouri, and divers other persons to the grand jurors unknown, the said E. L. Hendrey, one of the conspirators and who was acting for his associates in said agreement and conspiracy and for and in execution of the said conspiracy, did heretofore, before the finding of this indictment, on to wit, the 28th day of April, A. D. 1911, in the circuit and Western division of the district aforesaid, to wit, at Memphis, in the county of Shelby, in the state of Tennessee, and within the jurisdiction of this court, knowingly, unlawfully, fraudulently and feloniously deposit and cause to be deposited in the mails and the post office establishment of the United States, at Memphis, Tennessee, aforesaid, for mailing and delivery by and through the mails and the post office establishment of the United States a certain envelope duly stamped with a United States postage stamp and addressed to "Night and Day Bank, St. Louis, Mo.," which said envelope so stamped and addressed then and there contained the following letter, to wit:

"E. L. Hendrey, Pres.    Wm. V. Taylor, Vice Pres.    A. C. Cooke, Cashier.

"All Night and Day Bank.    Capital Stock, $50,000.    Surplus, $12,500.

"Directors:   J. H. Brooks, J. A. Johnson, A. C. Cooke, A. D. Gibson, J. S. Chick, Wm. V. Taylor, E. L. Hendrey, I. F. Peters, H. C. Wynne.

"Memphis, Tenn., April 28, 1911.

"Night and Day Bank, St. Louis, Mo.—Gentlemen: Confirming conversation with your Mr. White of even date, we herewith hand you our sixty-day note for $4,000.00, together with collateral amounting to $5,840.80. All of these notes are made by thoroughly responsible parties and will be paid promptly. We may possibly need to draw on you to-morrow for a part of this, but will in all probability carry the greater portion, or even more, with you from now on, as we have within the neighborhood of $10,000.00 coming in within this time.

"Assuring you we will highly appreciate your placing the amount of this note to our credit, and that we will be only too glad to return the favor at any time we may, we are,

"Yours very truly,             The All Night and Day Bank,
                                          "E. L. Hendrey."

Contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States.