## SNITKIN v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit.  March 30, 1920.)

### No. 2670.

1. **Criminal law ☞776(5)—Instruction that evidence of good reputation may create reasonable doubt should be given, where evidence conflicts.**

Refusal of a requested instruction that reputation for good character, if established, might alone create a reasonable doubt of defendant's guilt, *held* error, where the evidence was conflicting.

2. **Conspiracy ☞48—Question whether conspiracy is proved one for jury.**

On trial of defendant, charged with others with conspiracy to commit an offense against the United States, the question whether the conspiracy existed was one for the jury, to be determined on all the evidence, regardless of admissions of another defendant used as witness by the government.

3. **Statutes ☞241(1)—Criminal statutes strictly construed.**

All of the canons of interpretation that apply to civil statutes apply to criminal statutes, and in addition the canon that they are to be strictly construed.

4. **Indictment and information ☞128—Counts alleging identical facts charge but one offense.**

If two indictments, or two counts of one indictment, are identical, element for element, in necessary allegation and proof, then the two charges are for but one offense, and defendant cannot be tried thereon for separate offenses under different statutes.

5. **Statutes ☞225—Provisions of Selective Draft Act and Espionage Act in pari materia.**

The provision of Selective Draft Act, § 6 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2044f), making it an offense to aid another to evade the requirements of the act, and the provision of Espionage Act, tit. 1, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c), making it an offense to willfully obstruct the recruiting or enlistment service, to the injury of the service, are in pari materia : the same facts which would constitute an offense under the first provision also constituting an offense under the second, and the first provision being specific and the second general, the first governs, where the facts bring the offense within it.

6. **Army and navy ☞40—Specific offense against Selective Draft Act punishable only under that act, which was not repealed by the Espionage Act.**

The provision of Selective Draft Act, § 6 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2044f), making it an offense to aid another to evade the requirements of the act, was not repealed by implication by Espionage Act, tit. 1, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c), making it an offense generally to obstruct the recruiting or enlistment service, and a defendant charged in two counts, in identical language, with acts which would constitute an offense under either act, *held* subject to trial only under the Selective Draft Act.

Evans, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Indiana.

Criminal prosecution by the United States against Leonard A. Snitkin.  Judgment of conviction, and defendant brings error.  Reversed.

Plaintiff in error was tried, convicted, and sentenced to imprisonment for five years, on an indictment in two counts for conspiracy.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In the first count, omitting introductory matter and overt acts, the offense was stated as follows:

"That on or about the fifteenth day of September, in the year of our Lord one thousand nine hundred and seventeen, and thereafter up to and including the fifth day of October, in the year of our Lord one thousand nine hundred and seventeen, A. Joseph Schur, Maurice L. Snitkin, and Leonard A. Snitkin, in the state of New York and in the district of Indiana, acting together in each' of said states, did unlawfully, willfully and feloniously, conspire, combine, confederate, and agree together to commit an offense against the United States of America, to wit, to willfully obstruct the recruiting, enlistment and military service of the United States of America, to the injury of said service and the United States of America, by then and there fraudulently obtaining for the said ———— Swartz, whose true Christian name is unknown to these grand jurors, exemption from military service of the United States, the said ———— Swartz being then and there between the ages of 21 and 30 years, both inclusive, and registered for and eligible to military service as aforesaid, and .the said United States being then and there in a state of war with the Imperial government of Germany; said exemption to be fraudulently obtained by the said A. Joseph Schur, acting as the aforesaid government appeal agent, in the manner as follows, to wit: That said ———— Swartz would falsely pretend that he was residing either temporarily or permanently in the jurisdiction of said local board in Marion county, Indiana, and be transferred to said board for examination, and said Schur, as such agent, would also so, represent and pretend the same was true to said board, and  *  *  *  thereby falsely impose upon said board and its jurisdiction and authority. by having said ———— Swartz fictitiously assume residence in the jurisdiction of said board for the purpose of having said board examine into the military status, fitness and liability of said ———— Swartz for military service under said act, rules, and regulations; that said defendant, Leonard A. Snitkin, would pay said Scnur a large sum of money, to wit, $1,000, and otherwise favor him, and said Schur would accept same, as a corrupt bribe of said Schur to do said things as such agent and also that said Schur would make to said board for and on behalf of said ———— Swartz, false, fraudulent and fictitious claims, statements, representations, certificates, affidavits, and other information, and would also conceal from said board material and proper facts and information, and would fail, neglect, and refuse to perform the duty required of him as such agent by said act, rules, and regulations, all for the unlawful, corrupt, and fraudulent purpose of obtaining exemption of said ———— Swartz from military service under said act of Congress, and all for the purpose as aforesaid, without regard as to whether said ———— Swartz was justly or legally entitled to said' exemption."

The second count is word for word the same as the first, except that the pleader stated the view that the recited doings of the parties constituted a conspiracy to violate title; section 3 of the Espionage Act. Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c.

Section 6 of the Selective Draft Act is as follows:

"The President is hereby authorized to utilize the service of any or all departments and any or all officers or agents of the United States and of the several states, territories, and the District of Columbia, and subdivisions thereof, in the execution of this act, and all officers and agents of the United States and of the several states, territories and subdivisions thereof, and of the District of Columbia, and all persons designated or appointed under regulations, prescribed by the President whether such appointments are made by the President himself or by the Governor or other officer of any state or territory to perform any duty in the execution of this act, are hereby required to perform such duty as the President shall order or direct, and all such officers and agents and persons so designated or appointed shall hereby have full authority for all acts done by them in the execution of this act by the direction of the President.   Correspondence in the execution of this act may be carried in penalty envelopes bearing the frank of the War Department. Any person charged as herein provided with the duty of carrying into effect any of the provisions of this act or the regulations made or directions given

thereunder who shall fail or neglect to perform such duty; and any person charged with such duty or having and exercising any authority under said act, regulations, or directions, who shall knowingly make or be a party to the making of any false or incorrect registration, physical examination, exemption, enlistment, enrollment, or muster; and any person who shall make or be a party to the making of any false statement or certificate as to the fitness or liability of himself or any other person for service under the provisions of this act, or regulations made by the President thereunder, or otherwise evades or aids another to evade the requirements of this act or of said regulations, or who, in any manner, shall fail or neglect fully to perform any duty required of him in the execution of this act, shall, if not subject to military law, be guilty of a misdemeanor, and upon conviction in the district court of the United States having jurisdiction thereof, be punished by imprisonment for not more than one year, or, if subject to military law, shall be tried by court-martial and suffer such punishment as a court-martial may direct." Comp. St. 1918. Comp. St. Ann. Supp. 1919, § 2044f.

Section 37 of the Penal Code reads thus:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both." Comp. St. § 10201.

Section 3 of the Espionage Act provides:

"Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies and whoever, when the United States is at war, shall willfully cause, or attempt to cause insubordination, disloyalty, mutiny or refusal of duty in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service or of the United States, shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years or both." 40 Stat. 219.

Section 4 of the Espionage Act:

"If two or more persons conspire to violate the provisions of sections 2 or 3 of this title, and one or more of such persons does any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as in said sections provided in the case of the doing of the act the accomplishment of which is the object of such conspiracy. Except as above provided conspiracies to commit offenses under this title shall be punished as provided by section 37 of the act to codify, revise, and amend the penal laws of the United States approved March fourth, nineteen hundred and nine." Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212d.

Edward F. Dunne, of Chicago, Ill., and Elijah N. Zoline, of New York City, for plaintiff in error.

M. L. Ert Slack, of Indianapolis, Ind., for the United States.

Before BAKER, MACK, and EVANS, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). [1] Evidence for the government consisted largely of the testimony of Schur, a codefendant. Plaintiff in error took the witness stand and denied the case sought to be made by the government's proofs. He fortified his defense by character witnesses. He requested the court to charge the jury:

"You have heard evidence of the standing and reputation of this defendant, Leonard Snitkin, for good character. That reputation alone may create a reasonable doubt of this defendant's guilt in your minds, and is proper for you to consider."

In connection with this request counsel called the court's attention to Edgington v. United States, 164 U. S. 361, 17 Sup. Ct. 72, 41 L. Ed. 467. Instead, the court charged:

"If such defendant has in the community where he lives, by his incomings and outgoings among his neighbors, built up a good reputation among them for the qualities about which this testimony has been given, you should give that fact such weight as you think it is entitled to, taking into consideration all the other facts and circumstances established by the evidence."

Thus the court placed the evidence respecting good reputation on the same basis as the evidence relating to the substantive acts charged in the indictment, and directed the jury to give it such weight as they might think it entitled to, without furnishing them the legal scales in which to weigh it, namely, that a reputation for good character, if established, alone may create a reasonable doubt, although without it the other evidence would be convincing of guilt. In view of the contest between Schur and plaintiff in error over the jury's acceptance of one or the other of their conflicting stories, the error was prejudicial.

[2] Plaintiff in error requested the following instruction:

"I instruct you that the defendants cannot be convicted under either count of the indictment for attempting to form a conspiracy to do an unlawful act charged in the indictment; and if you find from the evidence that there was no completed or perfected conspiracy to do the things charged, there can be no conviction."

The court gave the following:

"This indictment charges that three persons, A. Joseph Schur, Maurice L. Snitkin, and Leonard A. Snitkin, conspired to violate this section. I may say to you now, in passing, that Schur and Maurice L. Snitkin, like Leonard A. Snitkin, have entered pleas of not guilty, but Schur has taken the witness stand, and not only admitted his complicity in this, but has admitted his guilt. Maurice L. Snitkin, though appearing in person and by counsel, has introduced no evidence, and his counsel has made no argument, and therefore the inference may be fairly drawn—it is for you to determine—that he is also guilty. So, therefore, and by the admissions of counsel for Leonard A. Snitkin, who were the only counsel who have spoken for the defense, it is established that there was a conspiracy between Schur and Maurice L. Snitkin, as alleged in the indictment; so, therefore, gentlemen, the only question for you to determine, and the only question for you to go out and deliberate upon, is as to whether or not Leonard A. Snitkin was a member of this conspiracy as alleged in the indictment."

Neither in the record proper nor in the bill of exceptions is there anything to warrant the statement that counsel for plaintiff in error admitted the existence of a conspiracy. Indeed, the contentions in support of a motion for a directed verdict of acquittal were that the government's case, taken at its face value, not only failed to show plaintiff in error's participation in forming a conspiracy, but also failed to establish any conspiracy, and that at most nothng was evidenced beyond a willingness to form a conspiracy. Neither Schur nor Maurice Snitkin, by their attitudes, opinions, or concessions of legal effect, could enlarge the true legal effect of the government's evidence, and convert into a conspiracy what the jury, under instructions on the law of conspiracy, might find from the evi-

dence was only a willingness or an attempt to form a conspiracy. It was therefore error, and in our judgment a prejudicial one, to withdraw from the jury their duty to find from the evidence the existence or nonexistence of a conspiracy, of which plaintiff in error could be a member. Konda v. United States, 166 Fed. 91, 92 C. C. A. 75, 22 L. R. A. (N. S.) 304.

A motion in arrest challenges the sufficiency of the indictment. We think the indictment states every necessary element, sufficiently advises plaintiff in error of what he had to meet, and would bar a second indictment for the same offense.

Other assignments of error go only to the granting of a new trial, and it is already apparent that that must be ordered.

Thus far all the members of the court are in agreement; but a divergence has arisen respecting the mandate. The majority are of the view that the new trial must be limited to the first count.

1. Allegations of fact control, and not the pleader's idea of what sections of the Penal Code are involved. This is a fundamental rule of criminal pleading, for the court takes judicial notice of all of the provisions of the Penal Code, and looks to the indictment only for the statements of fact which show the obnoxious conduct of the defendants.

Both counts in this case are conspiracy counts. The statements of fact with respect to the formation and the object of the conspiracy and the overt acts committed to effectuate it are identical in the two counts. In the first count the pleader stated in effect that this conspiracy was in violation of section 37 of the Penal Code (the general conspiracy statute), and that the object of the conspiracy was to obstruct the recruiting and enlistment service of the United States, but the pleader did not point out any particular section of any particular act. In the second count the pleader said that the conspiracy was under section 4 of the Espionage Act (which is the particular conspiracy statute that is limited to intended violations of sections 2 and 3 of the Espionage Act [Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 10212b, 10212c]), and that the object of the conspiracy was to violate the third clause of the third section of the Espionage Act, which denounces a willful obstruction of the recruiting and enlistment service to the injury of the service. While the pleader does not mention section 6 of the Selective Draft Act in the first count, he cannot have intended to bring the substantive offense, to accomplish which the conspiracy was formed, within the third section of the Espionage Act, because to do so would declare that intended violations of section 3 of the Espionage Act were within section 37 of the Penal Code (the general conspiracy statute), and not within section 4 of the Espionage Act, which clearly and unmistakably is the only conspiracy statute which can apply to intended violations of sections 2 and 3 of the Espionage Act.

Therefore, when we take judicial notice, as we must, of all penal statutes which affect the doings charged to have been committed by the defendants, we find that section 6 of the Selective Draft Act covers in detail the acts of the eligible conscript, Swartz, and of the

selective draft officer, Schur, and, inasmuch as an accessory is charge-. able as a principal, the acts of the defendant Snitkin are also particularly covered by said section 6; that is, if the object of the conspiracy had been effectuated, all would have .been guilty of violating section 6, and therefore the first count, which the pleader bases. on section 37 of the Penal Code, is for the crime of conspiring, including an overt act, to violate said section 6.

Consequently, if the Espionage Act had not been passed, no difficulty would be encountered in finding that the doings set forth in the indictment constituted a conspiracy under section 37 to violate section 6 of the Selective Draft Act.

[3] 2. Federal crimes exist only by virtue of federal statutes; but the law-making power is continuous. Congress can and does change, revise, substitute, amend, and repeal at its will; citizens and subjects are not consulted, and have no direct voice in choosing the phraseology. This situation has led to the universal adoption of the rule that penal statutes are to be strictly construed. This is a fundamental principle which, in our judgment, will never be altered. Why? Because the law-making body owes the duty to citizens and subjects of making unmistakably clear those acts for the commission of which the citizen or subject may lose his life or liberty. Therefore all of the canons of interpretation which apply to civil statutes apply to criminal statutes, and in addition there exists the canon which we have just stated. United States v. Wiltberger, 5 Wheat. 96, 5 L. Ed. 37; Todd v. United States, 158 U. S. 282, 15 Sup. Ct. 889, 39 L. Ed. 982; Bolles v. Outing Co., 175 U. S. 265, 20 Sup. Ct. 94, 44 L. Ed. 156. In contracts the defendant has been a participator in the framing of the document, and therefore there are rules which are applicable to such a situation that are inapplicable to the interpretation of a criminal statute in which the citizen or subject has had no opportunity to express the intended meaning. The burden lies on the lawmakers, and inasmuch as it is within their power, it is their duty to relieve the situation of all doubts.

[4] 3. Citations of cases of overlapping statutes and of two or more crimes inhering in the same transaction are beside the mark. Of course, two or more crimes may be committed in the same transaction; for example, rape and incest. If a defendant has had sexual intercourse with a female under the age of consent, he has been guilty of the crime of rape. If he has committed .but the one act of sexual intercourse, and if that has been with a female under the age of consent, and if that female is also within a prohibited relationship, the defendant is also guilty of the crime of incest. But there the element of relationship is an essential ingredient of the crime of incest, while it is no element at all of the crime of rape. If there were two counts of an indictment against such a defendant, the counts would differ in the respect we have mentioned and the evidence would have to establish the same distinction. Here the allegations and also the proofs of fact under the two counts are identical. Not merely the transaction is the same, but the offense, item for item, in allegation of fact and in proof of fact, is the same. The elementary prin-

ciple is safeguarded in the Constitution that no one shall be punished twice for the same offense. If the two indictments, or the two counts of one indictment, are identical, element for element, in necessary allegation and proof, then the two charges are but for one offense. 15 Corpus Juris, 264, 265; United States v. Nickerson, 17 How. 204, 15 L. Ed. 219; Ryan v. United States, 216 Fed. 37, 38, 132 C. C. A. 257; Stone v. United States, 167 U. S. 185, 17 Sup. Ct. 778, 42 L. Ed. 127.

[5] 4. The matters in the two sections are in pari materia. If the Espionage Act had not been passed, the doings charged would be attributed to an intended violation of section 6 of the Selective Draft Act, which specifically covers the matter of both counts. If the punitive portion of the Selective Draft Act had not been passed, the doings charged in both counts would properly be found to be an intended violation of the general prohibition in section 3 of the Espionage Act, denouncing obstructions of the recruiting and enlistment service. When there is a word for word identity of charges in the two counts, we fail to understand how the two sections, which may be read upon the allegations of fact, the one in specific language and the other in general language, can fail to be in pari materia.

A contention was made that the two sections are not in pari materia because of differences in the titles of the two acts. What we have called the Selective Draft Act is entitled "An act to authorize the President to increase temporarily the military establishment of the United States." "Offenses against the operation of the government" is the title of the other. It is commonly called the Espionage Act, on account of the subject-matter with which it is principally concerned. But the title was certainly broad enough to warrant Congress in including within the quoted section 3 the clause against "willful obstruction of the recruiting or enlistment service of the United States to the injury of the service or of the United States." This clause is the only one which deals with the recruiting and enlistment service—a subject-matter which had been particularly provided for in the Selective Draft Act. It seems to us that the contention comes to this: Statutes are not in pari materia unless they are identical in title and in terms; or criminal statutes are things apart, to which the established canons for ascertaining the legislative intent are not applicable.

Emphasis was also laid on the fact that the words "to the injury of the service" do not appear in the punitive portions of section 6 and the other sections of the Selective Draft Act. Neither do the words "willful obstruction of the recruiting or enlistment service." Yet every punitive provision in the Selective Draft Act is for one or another specific willful obstruction of the recruiting or enlistment service, and is of such a character as necessarily to be an injury to the service. When Congress thought of inserting in the Espionage Act a "catch-all" clause against obstructions of the recruiting and enlistment service (quite like the "catch-all" clause in tariff acts), Congress undoubtedly had the power to denounce all obstructions. But because Congress limited itself to willful obstructions that are

injurious (as if anything that was in truth an obstruction could be other than injurious), it does not follow that the subject matter of the "catch-all" clause was not the obstruction of the recruiting and enlistment service because the "catch-all" was not made as broad as it might have been. That clause is nevertheless general legislation on the subject of obstructions of the recruiting and enlistment service, and the punitive portions of the Selective Draft Act are special denouncements of special obstructions.

[6] 5. The case must go back for a new trial. The remaining question, which we are now endeavoring to solve, is whether Snitkin should be tried for an intended violation of section 6 of the Selective Draft Act or section 3 of the Espionage Act. We think it is indisputable that there is but one offense involved, and that Snitkin cannot properly be subjected to a judgment and punishment for two crimes. If the government were conceded the right to elect under which statute it would prosecute, it would probably choose the Espionage Act as authorizing the heavier penalty, but in our judgment the district attorney cannot be permitted to make such an election. To allow the district attorney to say that the prosecution should proceed under the Espionage Act would be to let him decide that the third clause of section 3 of the Espionage Act had worked an implied repeal of the punitive portions of section 6 of the Selective Draft Act. That is impermissible, because the question is a judicial one.

6. What is the proper construction to be placed upon these statutes which stand in pari materia? Of course the purpose of all canons of construction is to ascertain the legislative intent. That is the pole star of interpretation. And of course the first rule, and the only rule if it can be applied, is that, if the language employed by the law-making body is plain and unambiguous, the plain and unambiguous language must be accepted as embodying the legislative intent. As we have heretofore suggested, if the Selective Draft Act were the only expression of congressional intent, we should have no difficulty in reading section 6 of the Selective Draft Act upon and applying it to the facts alleged in the two counts; and likewise if the Espionage Act were the only expression of congressional intent, we should have no difficulty in reading the language of the third clause of section 3 of the Espionage Act upon and applying it to the facts set forth in the two counts. Admittedly there is no uncertainty when each act is looked to alone. But we cannot look to one act alone. On May 18, 1917, Congress expressed a certain intent —expressed it in specific language, which specifically applies to the specific facts set forth in the two counts. On June 15, 1917, Congress expressed a certain intent, expressed it in language which in general terms covers the specific facts set forth in the two counts. The particular question we have to solve is whether Congress, when it used the general terms of June 15th, intended to repeal the specific terms of May 18th. If we can find the intent of Congress, we agree that we must respect and enforce that intent. But Congress did not directly express any intent to repeal the punitive portions of sec-

tion 6 of the Selective Draft Act. If any repealing intent had been present in the mind of Congress, it would have been easy for Congress to have expressed that intent in suitable language. Since there is no direct repeal, if any repeal exists it must be a repeal by implication. At this point comes in a canon of interpretation which has always been respected, namely, that repeals by implication are not favored. Of course there are many cases of repeals by implication. But the rules for finding such a repeal are clear and have long been settled.

Our recollection of text-books and decisions corresponds with the summary found in 36 Cyc. 1073-1079, under the subhead of "Modes of Implied Repeal."

An implied repeal may be found in a revision or codification. Such revision or codification is, prima facie, supposed to represent the current legislative will on the subject. But that does not touch our case.

Repeals by implication are also found when a later act covers the entire subject-matter of an earlier act. And neither does this apply to our case.

The main and most frequently used rule with respect to implied repeals is that an earlier act is supposed to be repealed by implication, if a later act is so inconsistent with or repugnant to the earlier act that no purpose can be attained under the later act if the earlier is allowed to stand. But this rule is not effective in our case, because the general terms of section 3 of the Espionage Act can be made to apply, as they have already frequently been made to apply, to all sorts of acts of obstructing the recruiting and enlistment service which are not the specific acts denounced in section 6 of the Selective Draft Act. In other words, there is not such repugnancy as to prevent section 3 of the Espionage Act from having a large scope of use if section 6 of the Selective Draft Act is allowed to stand.

We are therefore brought to consider the question, What is the rule for ascertaining the legislative intent when the Legislature has used at one place general terms which would cover one specific act and all other acts of like nature, and when the Legislature has used at another place specific terms which cover only one species of the genus?

If Congress should legislate respecting a genus and then later in the same act or in a subsequent act should deal particularly with a species of the genus, there should be no difficulty in recognizing the applicable canon of construction, "Generalia specialibus non derogant." A contention was advanced that this canon is not applicable where the species was treated of in advance of the treatment of the genus. But on what basis can it be assumed that Congress on June 15th did not have full and exact knowledge of the specific measures it had adopted on May 18th? For example, in section 5 of the Selective Draft Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2044e), Congress had made it the duty of Swartz to present himself for registration and had defined the punishment he should receive if he failed to register. That was an express declaration of congressional intent on a specific subject. If that declaration had been made subsequent

to June 15th, there would be no doubt that Swartz, if he had failed to present himself for registration, could only have been subjected to the punishment described in said section 5 of the Selective Draft Act. For, if that provision had been made subsequent to the Espionage Act, how could any one say that Congress failed to remember that it had prior to that time passed a general law that all obstructions of the recruiting and enlistment service of whatever nature should be punished in a much severer manner? The maxim is always applicable that Congress at all times is chargeable with knowledge of its own doings. If Congress, knowing that it had already passed a general prohibition of all methods of obstructing the draft, had thereafter provided a particular punishment for the particular method of obstructing the draft by the failure. or refusal of an eligible conscript to present himself for registration, the courts would naturally and inevitably say that the congressional intent was that the particular obstruction should not be included within the general denunciation of all obstructions. Now what difference can it make if Congress treats of a species before treating of the genus? Can it any the more be said that Congress is not continuously chargeable with knowledge of its own doings? When Congress comes to treat of the genus, it knows that it has already treated of one species; and therefore, when it treats of the genus, Congress is chargeable with the intent to have the particular species stand as an exception to the general rule which it is now making to apply to all species of the genus except the one that has already been selected for particular treatment; that is, Congress is chargeable with knowledge of its own prior doings in either case. Such it seems to us, is the sound reasoning of the matter; and such certainly is the declared law.

We know of no better and more succinct statements of the rule than are found in Black on Interpretation of Laws and in Sedgwick on Statutory Construction.

Black says:

"As a corollary from the doctrine that implied repeals are not favored, it has come to be an established rule in the construction of statutes that a subsequent act, treating a subject in general terms and not expressly contradicting the provisions of a prior special statute, is not to be considered as intended to affect the more particular and specific provisions, of the earlier act, unless it is absolutely necessary so to construe it in order to give its words any meaning at all."

Sedgwick says:

"The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms or treating the subject in a general manner and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction, in order that its words shall have any meaning at. all."

These propositions of the text-writers, together with equivalent expressions from English and American courts, are quoted as correct expositions of well-established law in Rodgers v. United States,

185 U. S. 88, 22 Sup. Ct. 582, 46 L. Ed. 816. We have also examined United States v. Tynen, 11 Wall. 88, 20 L. Ed. 153, United States v. Claflin, 97 U. S. 546, 24 L. Ed. 1082, King v. Cornell, 106 U. S. 395, 1 Sup. Ct. 312, 27 L. Ed. 60, Red Rock v. Henry, 106 U. S. 596, 1 Sup. Ct. 434, 27 L. Ed. 251, Ex parte Crow Dog, 109 U. S. 556, 3 Sup. Ct. 396, 27 L. Ed. 1030, United States v. Ranlett and Stone, 172 U. S. 133, 19 Sup. Ct. 114, 43 L. Ed. 393; Kent v. United States, 73 Fed. 680, 19 C. C. A. 642, and Morgan v. Ward, 224 Fed. 698, 140 C. C. A. 238. But these cases do not add to or subtract from the rule as stated in the Rodgers Case. Nowhere have we been able to find any text-writing or court decision which in any way questions the correctness of the rule as laid down in Black and in Sedgwick.

7. It was urged that the canon of interpretation that statutes should not be so construed as to produce an absurd result has a bearing on the question under consideration. The canon as a canon is perfectly sound, and has been frequently used in situations to which it may justly be applied. The supposedly absurd results in the present case are predicated upon the difference in penalties. Never before have we heard it urged that the fixing of penalties was not a matter of legislative judgment and that a court could declare that a punishment decided upon by Congress was absurdly high or absurdly low for an offense which Congress had created. If a species is assessed with a higher or with a lower punishment than Congress prescribes for the genus, we can see no basis on which a court could pronounce the action of Congress to be absurd. If the species were treated of subsequently to the treatment of the genus, we see no greater nor less absurdity in the action of Congress in affixing a lighter punishment for the selected species than it had already prescribed for the genus, than in the action of Congress in letting a special statute stand unrepealed which provides for a lighter punishment than is given in the subsequently enacted general statute. At all events we believe that there is no basis on which judges who disagree with Congress on its admeasurement of punishments can say that the creation of species and genus is absurd because the species is deemed by the judges to be a more heinous offense than the remaining species comprehended within the generic statute. But personally we agree with the admeasurement that Congress fixed. The particular offense of an eligible conscript in failing or refusing to register is less detrimental to the nation's exertions in war than the attempts of spies and dynamiters and anarchists to raise a spirit of insubordination and resistance to the efforts of the government to recruit and maintain an efficient army. The conscript who runs away or obtains an improper exemption is the individual case. The spy, the dynamiter, the anarchist, is operating upon large bodies of people, and may be considered to be opposing the whole public effort. From the point of view of personal courage and personal honesty, the conscript who hides or the petty official in the conscription machinery who yields to petty graft may be much more contemptible than the spy who risks his life to learn military secrets or

the anarchist who risks his freedom in trying to undermine the people's willingness to support the government in war; but the effect upon the efforts of the government is certainly much less in the case of the hiding conscript or the grafting draft officer than in the case of the spy or the anarchist. And finally, the fixing of punishment is no part of the creation and definition of the offense. Any absurd result, therefore, which could be controlling, would have to be an absurdity in the creation and definition of the offense, and not the supposed absurdity of giving one offense a greater punishment than another.

The judgment is reversed, with the direction to order a new trial upon the first count alone.

EVANS, Circuit Judge (dissenting). Both counts of the indictment charge conspiracy; the first, to violate section 6 of the Conscription Act; the second to violate section 3 of the Espionage Act. The majority opinion holds that the two sections of the statutes referred to are in pari materia; that so far as they deal with the specific acts set forth in the indictment the former alone applies due to the rule of construction, "Generalibus specialibus non derogant."

Are the statutes in pari materia? If not, there can be no application of this rule. The query invites another. Are criminal statutes ever in pari materia? Or, perhaps, to be more accurate, can the rule "Generalibus specialibus non derogant" ever apply to two criminal statutes? While an answer to the latter question is not necessary to the decision of this case, it is worthy of consideration.

The rule of construction, "Generalibus specialibus non derogant," is a common-sense one, and doubtless owes its origin to judicial efforts to construe contracts containing conflicting or inconsistent provisions. It is elementary that where parties have entered into a written agreement, and in their contract appear general as well as special provisions relating to the same matter, the latter govern in case of inconsistency or repugnancy. For the same reasons, statutes dealing with the same subject-matter which are inconsistent or repugnant may be subject to this same rule of construction. But in all such instances, where the rule is invoked, there must be inconsistency or repugnancy in the sections under consideration, and they must relate to the same subject-matter.

Another rule of construction applicable alike to contracts and statutes, and equally well supported in reason, requires the court to give effect, if possible, to each and every provision of the contract, and to each and every section of the statute.

Criminal statutes are essentially statutes of prohibition. There is, generally speaking, no inconsistency and no repugnancy to be found in their provisions. Every criminal statute prohibits. Each deals with offenders who do prohibited acts. Such differences as exist must necessarily be limited to the punishment provisions. There is, for instance, no repugnancy between a statute that prohibits interference with registration and a statute which prohibits interference with military or naval forces. They may overlap, but they do not conflict. Both prohibit.

It is doubtless due to this fact that courts have uniformly held that the same act or group of acts may constitute two or more distinct criminal offenses, different in kind as well as in degree. 16 Corpus Juris, 58; People v. Nall, 242 Ill. 284, 291, 89 N. E. 1012; Nagel v. People, 229 Ill. 598, 82 N. E. 315; Fleming v. State, 174 Ind. 264, 91 N. E. 1085; State v. Johns, 140 Iowa, 125, 118 N. W. 295; State v. Burns, 82 Conn. 213, 72 Atl. 1083, 16 Ann. Cas. 465; Commonwealth v. Harris, 13 Allen (Mass.) 534; State v. Pomeroy, 30 Or. 16, 46 Pac. 797. To illustrate: One may be found guilty by the same act of committing the separate crimes of robbery and larceny; of perjury and false oath; of rape and adultery, or of rape and bigamy; of assault with intent to murder and assault with intent to rob; of maintaining a gaming device and establishing a lottery.

In the construction of a criminal statute, in other words, no reason exists to support the rule, and there can therefore be no logical application of the rule, "Generalibus specialibus non derogant."

While it is true in some states a conviction under one section may bar a subsequent conviction under another statute, these decisions are but an application of the rule of election of remedies, which courts so commonly apply in many kinds of actions brought against wrongdoers. But this rule, that limits the state to but one criminal prosecution and requires it to elect which prosecution will be pursued, is by no means of universal application. In the absence of any statute to the contrary, the weight of authority seems to be that the state may prosecute all offenses, and conviction under one statute will be no bar to conviction under another statute for the same act or acts.

Statutes are not in pari materia simply because they relate to the same general subject-matter. "The word 'par' must not be confused with the term 'similis.' It is not mere likeness, but identity of person or subject-matter, that is necessary." For example, larceny and burglary deal with somewhat similar subject-matters, as do murder and manslaughter, petit larceny and grand larceny, hunting without a license and hunting protected game; yet the statutes defining these crimes are not in pari materia.

Nor do the facts under consideration deal with the same persons or class of persons. One may violate section 3 of the Espionage Act though he does not violate section 6 of the Conspiracy Act.

It is not the presence of common acts condemned by two criminal statutes, but the presence in one of an element absent in the other, that determines whether the two statutes are in pari materia. The two statutes under consideration are set forth verbatim in the majority opinion. The portion of section 3 which is the object of the conspiracy set forth in the second count provides:

"Whoever, when the United States is at war, * * * shall willfully obstruct * * * the recruiting or enlistment service of the United States *to the injury of the service of* the United States shall be punished," etc.

I fail to find in the crime denounced by section 6 of the Conscription Act any element such as is expressed by the italicized words

just quoted. While it may be that proof of injury "to the service of the United States" may be readily obtained, if it appears that there has been a willful obstruction to the recruiting or enlistment service, yet we are not authorized, in determining the similarity of the two offenses, to ignore this element in the crime defined by the Espionage Act.

Again, the fact that the acts which constitute a violation of section 6 may support a conviction under the Espionage Act does not meet the test, first, because such acts do not necessarily require a conviction under the Espionage Act; and, second, because Congress was dealing with two separate subject-matters when it passed the commonly called Conscription Act and the commonly called Espionage Act.

When enacting the Conscription act, Congress was dealing with a subject entitled "An act to authorize the President to increase temporarily the military establishment of the United States." When the Congress enacted the so-called Espionage Act it was dealing with a subject entitled "Offenses against the operation of the government." In United States v. Hirsch, 100 U. S. 33, 25 L. Ed. 539, it was held that section 37 of the Criminal Code was not in pari materia with the revenue law, although a conspiracy to violate the revenue law came within the provision of section 37 of the Criminal Code. Now a violator might, and probably would, be dealing with the general subject "the operation of the government" when he was attempting to defeat an enlistment in the army. But one subject is more comprehensive than the other.

Nor does the fact that the allegations and the proofs of fact under the two counts are identical meet the test in view of the fact that each count is for a conspiracy. In conspiracy counts the criminal object need not be set forth with the particularity that would be required if the object of the conspiracy was the substance of the offense charged. Jelke v. United States, 255 Fed. 264, 166 C. C. A. 434. A., B., and C. may have conspired, and by the same means, to violate two criminal statutes at the same time. To illustrate again: Two or more persons may with the same motive have conspired to violate the second clause of section 3 of the Espionage Act, and by the same means (the circulation of false and prejudicial literature) to violate section 6 of the Conscription Act. In other words, it is not strictly correct to say of conspiracy counts that "if the two counts of one indictment are identical, element for element, in necessary allegation and proof, then the two charges are but for one offense," unless the object of the conspiracy is included in the allegations. Necessarily the difference in the conspiracy counts under these circumstances would be limited to the objects of the conspiracy.

But if we concede the two statutes are in pari materia and further admit that the rule "Generalibus specialibus non derogant," applies to criminal statutes, it does not necessarily follow that such a rule should govern the construction of section 3 of the Espionage Act. This rule is but one of many rules of construction by which the court may ascertain the intention of the law-making body. 25 R. C. L. 960;.

Rodgers v. U. S., 185 U. S. 83, 86, 22 Sup. Ct. 582, 46 L. Ed. 816. This rule cannot be invoked except in case of doubt (25 R. C. L. 1062; Yerke v. U. S., 173 U. S. 439, 19 Sup. Ct. 441, 43 L. Ed. 760) where ambiguity makes the legislative intent uncertain. In the present case there is no ambiguity, no uncertainty in the language of section 3 of the Espionage Act. Congress was dealing with a most serious offense. It was dealing with a felony which, if not treason, was its twin sister. The crime was defined with definiteness and certainty. No exceptions were provided. The maximum penalty was fixed at 20 years in the penitentiary and a fine of $10,000.

That the alleged action of the plaintiff in error came within the literal prohibition of this section cannot be and is not disputed. Are we, then, justified in reading into the statute an exception? Can we say Congress intended to cover all who "shall obstruct the recruiting or enlistment service of the United States to the injury of the service," except the individual who, at the same time that he committed this infamous crime, also violated another statute, and thereby committed a misdemeanor? Did Congress intend to permit a felon to escape, if perchance he also was guilty of a misdemeanor? Can a murderer escape, because in so offending he committed assault and battery? Does the adulterer avoid responsibility for his criminal offense by producing a statute covering fornication, or may the gambler plead a statute making it a misdemeanor to maintain a gaming device, when called upon to plead to an indictment charging him with establishing a lottery? Clearly not.

In fact, if the means by which the crime in the instant case was to be committed be examined, we find them to be most repulsive. Violations of this section were accomplishable in various ways. Plaintiff in error, if guilty, conspired to interfere with the recruiting and enlistment service by means of corruption and bribery. At a time when his country was at war, he is charged with attempting to corrupt the official whose solemn responsibility it was to select from the millions of registrants those who should suffer the hazards and endure the hardships of military duty at the front. No more solemn responsibility could be demanded of public official. Could Congress have intended that one who should thus violate section 3 of the Espionage Act came within the provisions of an implied exception?

As I view the issue there is no question of repeal by implication involved. Like many other criminal statutes it is a mere case of overlapping. Likewise there is no room for the application of the rule of strict construction, which is properly invoked in criminal cases where doubt exists. It seems, therefore, to be a proper case for the application of the rule:

"Where the language of a statute is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion for resorting to rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning." 25 R. C. L. 962; United States v. First National Bank, 234 U. S. 245, 258, 34 Sup. Ct. 846, 58 L. Ed. 1298.

While I agree that there should be a reversal of this judgment, I think the new trial should be on both counts of the indictment.