## KAUFMANN et al. v. UNITED STATES. *

(Circuit Court of Appeals, Third Circuit. August 11, 1922.)

No. 2806.

**1. Post office ⬤⟶48(4)—Indictment charging use of mails to defraud held sufficient.**

An indictment stating the offense in the words of Pen. Code, § 215 (Comp. St. § 10385), penalizing the use of the mails to defraud, and alleging that defendants used the mails to carry out a preconceived scheme, pursuant to which they organized a corporation, secured a credit for it by paying its bills promptly, and then bought large quantities of goods on credit, which they did not intend to pay for, sold them below cost, and put the proceeds out of reach of the defrauded sellers, *held* sufficient.

**2. Indictment and information ⬤⟶60—Object of indictment stated.**

The object of an indictment is to furnish the accused with such a description of the charge against him as will enable him to prepare his defense, to plead his acquittal or conviction in bar of another prosecution, and to inform the court of the charges, so that it may decide whether they are sufficient to support a conviction.

**3. Post office ⬤⟶35—Use of mails to carry out intentional scheme to defraud, though no misrepresentation made, held unlawful.**

However impractical a scheme may be, the use of the mails to execute it does not constitute a crime, if it was devised in good faith; but if it is devised with the intention of defrauding, and the mails are used in executing it, an offense is committed, though there is no misrepresentation of fact, as the purpose of the statute is to protect the public against intentional efforts to defraud.

**4. Post office ⬤⟶50—Whether defendants used mails with intent to defraud a question for jury.**

Whether defendants used the mails with the intent to defraud is a question for the jury.

**5. Post office ⬤⟶49—Evidence held to sustain conviction for using mails to defraud.**

Evidence *held* sufficient to sustain the conviction of all the defendants for using the mails to defraud by knowingly participating in a scheme to buy goods and not pay for them.

**6. Post office ⬤⟶49—Evidence of additional voluntary payments by third parties admissible in prosecution for fraudulent use of mails.**

Where an indictment for fraudulent use of the mails alleged that defendants organized a corporation to buy without intending to pay for goods, sell them quickly, regardless of price, and dissipate the proceeds, evidence of the amount which persons buying goods from this corporation voluntarily paid its receiver, as representing the difference between the cost and the selling price, was admissible.

**7. Criminal law ⬤⟶1120(9)—No error to admit exhibit not before appellate court.**

The admission of an exhibit in evidence, which, on appeal, was not produced, cannot be reviewed.

**8. Post office ⬤⟶49—Letter sent through mails, containing misleading statements, admissible.**

In a prosecution for fraudulent use of the mails, a letter containing misleading financial statements for the purpose of securing credit, sent through the mails, was admissible.

**9. Post office ⬤⟶50—Instruction as to intention not to pay for goods bought through use of mails properly refused.**

Where the indictment alleged a fraudulent use of the mails to buy goods, paying for them to establish a credit, and then buying others,

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 258 U. S. —, 43 Sup. Ct. 96, 67 L. Ed. —.

which were not to be paid for, a request that, to commit the offense, defendants must not intend to pay for goods at the time the order was placed, was properly refused, as not recognizing that part of the goods were to be paid for; if the request had been limited to intent not to pay for goods ordered after a credit had been established, it should have been given, unless covered by the general charge.

10. **Criminal law** ⊜⇒561(3)—**"Good reputation," standing alone, not sufficient to create reasonable doubt.**

A "good reputation" is the result of right thinking as reflected in right living, in a course of honest dealing and honorable conduct, and it should be an important factor in determining the guilt or innocence of accused; but, standing alone, it is not sufficient to create a reasonable doubt.

11. **Criminal law** ⊜⇒822(6)—**Instruction as to necessity of agreement held not erroneous, when construed in connection with whole charge.**

A sentence stating that conspirators need not make any agreement with each other was not error, for, when construed in connection with the charge as a whole, it then showed that the judge meant that conspirators need not directly make any agreement, but, if they are working together in concerted action for an unlawful end, the jury might conclude that there was a conspiracy.

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Benjamin B. Kaufmann and others were convicted of using the mails to defraud, and they bring error. Affirmed.

Elijah N. Zoline, of New York City, and Louis Little, of Pittsburgh, Pa. (Chester H. Krum, of St. Louis, Mo., of counsel), for plaintiffs in error.

Walter Lyon, U. S. Atty., and Arnold M. Replogle, Asst. U. S. Atty., both of Pittsburgh, Pa.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. The defendants below are here on writ of error to review the judgment of their conviction on an indictment charging them with having devised a scheme or artifice to defraud, and with having used the post office establishment of the United States for the purpose of executing their scheme, in violation of section 215 of the federal Penal Code (Comp. St. § 10385). The indictment contains five counts. The first four are substantially alike, and set out the scheme; the difference being in the persons to whom letters are sent in carrying it out. The fifth count charges defendants with having conspired to commit an offense against the United States by violating section 215 of the Penal Code, as set forth in the other counts.

[1] The defendants are charged with having devised a scheme to defraud and obtain money from the Muhlenbruch Glove & Mitten Company, of Decatur, Ill., the Reliance Suspenders Company, of Philadelphia, and such other firms and corporations, doing business in the United States, as might be induced to enter into business relations with them. As a part of their scheme, it is alleged, they organized a corporation, the B. B. Kaufmann Company, under the laws of the state of Pennsylvania, with a capital stock of $40,000, divided into

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4,000 shares, of the par value of $10 each, with Benjamin B. Kaufmann president and treasurer, F. J. Schellman vice president, Nathan Kaufmann secretary, and Alfred W. Kaufmann assistant secretary, and opened up a wholesale store at 139 Seventh street, in connection with a five and ten cent store at 533 East Ohio street, North Side, Pittsburgh. They were to order large quantities of merchandise, consisting of ladies' and gentlemen's wearing apparel, hardware, notions, etc., from the persons or companies to be defrauded, and, in order to establish a basis of credit and reputation for honesty, fair dealing, and for the payment of their bills, they, in the first instance, were to pay their bills when due, or within a reasonable time thereafter. When their reputation had thus been established, they were to give orders for large shipments of merchandise, with the intention not to pay for it, to be promptly delivered under the promise, however, of immediate payment upon delivery. They were to sell this merchandise to their friends and others at cost, or prices lower than they paid, convert it into cash, and dissipate and put out of the reach of those defrauded the assets of the company, so that it would be forced into bankruptcy, with its property converted to their use and benefit.

The indictment further charges that in executing their scheme the defendants sent letters through the United States mails to the persons mentioned in the four counts of the indictment. The defendants were tried, convicted, and sentenced. Counsel for defendants have presented a carefully prepared brief, alleging error in their conviction, and fully discussing the errors upon which they rely. The questions involved are stated in the following propositions:

1. The indictment does not sufficiently set forth the crimes intended to be charged.

2. The evidence is not sufficient to sustain the conviction of all the defendants.

3. The trial judge erred in: (1) The admission of evidence; (2) his refusal to charge the jury as requested; (3) defining conspiracy.

If the indictment is defective, the demurrer should have been sustained, and the charges, so far as this indictment is concerned, ended then and there.

[2] The object of an indictment is, first, to furnish the accused with such a description of the charge against him as will enable him (1) to prepare his defense and (2) to plead his acquittal or conviction in bar of further prosecution for the same offense; and, second, to inform the court of the charges, so that it may decide whether or not they are sufficient in law to support a conviction. United States v. Cruikshank et al., 92 U. S. 542, 558, 23 L. Ed. 588. Does the indictment under consideration meet these requirements? It not only states the crime in the language of the statute as a foundation for the charge, but it sets out the scheme in detail which the defendants had devised, and shows explicitly how and when it was carried out by use of the mails. We think the defendants were in no wise deceived, but were fully apprised of the charge which they were called upon to meet. They do not cite any particular in which they were misled or unprepared for trial. They may plead their conviction in bar of further prosecution

for the same offense. United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516. The statute provides:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, * * * shall, for the purpose of executing such scheme * * * place or cause to be placed, any letter * * * in any post office, * * * shall be fined," etc.

The indictment charges that the defendants "devised and intended to devise a scheme and artifice to defraud." Counsel says:

"Defendants are charged with having in the past devised a scheme, and in the same breath with intending to devise in the future the scheme which in the past they had already devised," and that "such a repugnance and contradiction" does not "advise persons accused of the nature and cause of the accusation, to the end, among other essentials, that they may prepare their defense."

The charge that they "devised and intended to devise," or that they "had unlawfully devised and intended to devise," does not refer to the past and future; but the tense, past-perfect, in both "had devised" and (had) "intended to devise" is the same. In neither case does the pleader look to the future. The defendants not only devised, but they intended to devise; they succeeded in their intention. They did not devise a scheme innocently, but they did just what they intended to do. This is really in accordance with what counsel for defendants later says:

"It is obvious that Congress meant 'having devised' to involve the intent to devise, thus seeking to exclude the idea of mistake, but resting the whole matter on a fraudulent or criminal purpose."

[3] The words "intending to devise" are the legal scales by which the scheme devised must be weighed. However impractical and visionary a scheme may be, the use of the mails to execute it does not constitute a crime, if it was devised in good faith. On the other hand, if a scheme is devised with the intention of defrauding, and the mails are used in executing it, it makes no difference that there is not a misrepresentation of a single existing fact.

"It was with the purpose of protecting the public against all such intentional efforts to despoil, and to prevent the post office from being used to carry them into effect, that this statute was passed." Durland v. United States, 161 U. S. 306, 314, 16 Sup. Ct. 508, 511 (40 L. Ed. 709).

[4] The question of intent was a fact to be found by the jury from all the evidence, and the verdict settles the fact, if the evidence is sufficient to sustain it. The indictment did not leave the defendants in a dilemma as to whether they were to prepare to defend a scheme already devised in the past, or a scheme which they intended to devise in the future, but which never came into actual existence. There was only one scheme which the defendants had to prepare to meet, and that was the scheme, intentionally devised, set out with reasonable particularity in the indictment, and for the execution of which the post office establishment of the United States was used as charged.

While the fifth count for conspiracy does not expressly state that the defendants conspired to use the mails in executing the scheme, it does state that they conspired to commit an offense against the

United States, and then sets out, both by reference and expressly, the scheme and the execution of it, by specifying the particular use of the mails by which it was carried out, without which there would not have been any crime. So the allegation that they conspired to "commit an offense," with the statement of the complete offense, was in fact an allegation that they conspired to commit both elements of the offense—a devised scheme and use of the mails in executing it.

We are satisfied that the defendants were not misled, but that they knew just what charges they were to meet, and went to trial armed with the fullest preparation they could make for their defense. The indictment was sufficient, and the demurrer was properly overruled.

[5] The government produced at the trial evidence showing that the business of the Kaufmann Company was poor during the early part of 1920, but within that period the defendants sent out hundreds of letters requesting samples and inviting firms, before never dealt with, to sell merchandise to them, or the company through which they were operating; that in May and June of that year as many as 150 orders were given for merchandise of the value of $120,000; and only a small part of it was ever paid for; that the receipt of merchandise from orders placed in these months of depression was much larger than usual; that it was immediately sold, much of it below cost, and reshipped without being unpacked. John J. Scott, an employee, testified:

"I don't know the volume of merchandise that was coming in there during that time to the B. B. Kaufmann Company, but it came in pretty fast, kept us busy all day long, from the time we came in until we went out, receiving goods and shipping goods;" that he received all the merchandise that came in, and shipped out all that went out; that for a time he kept a record in a book of all the goods received, and in another book a record of the goods shipped, noting the date, name, and address of the party to whom shipped, until about five weeks before the company went into bankruptcy, when he was ordered by Louis Kaufmann and Alfred W. Kaufmann not to keep any further records until he got a new book, which he never got; that thereafter he tried to keep a record himself, but the goods came in so fast that he mislaid it, and thought it was no use.

The record book was not produced at the trial. Scott further testified:

"I don't know what was going on at night. I wasn't there [at the store]. * * * Four or five times I went there and found men there, and knocked on the door, and had to wait five or ten minutes before they opened it up, and at other times would find the elevator loaded, and they would take them out and put them on the trucks. They were loaded with cases of goods. In the morning I found Mr. Nathan Kaufmann and Louis Kaufmann and Al. Kaufmann, and one morning I found Mr. Gordon. One morning I went there, and Mr. Louis Kaufmann, Mr. Al. and Mr. Nathan Kaufmann were there. Two of them were in their bare feet. We found the elevator full of cases already packed up."

This evidence was sufficient to sustain the conviction of all the defendants who knowingly participated in the scheme or its execution. The jury found that all the plaintiffs in error took part in it at one time or another. The testimony shows that B. B. Kaufmann was president of the corporation, signed checks, dictated at least two letters to Margaret Davidson, who had charge of mailing letters, and John J. Scott testified that:

"I was a witness before the United States commissioner at the hearing in this case. I saw all of the defendants there at that hearing. After I had given testimony, I was approached by Mr. B. B. Kaufmann. He wanted me to go as light as I could, not to say anything, and he would fix me up later, and to tell them, if they asked where Mr. Gordon's place was, that it was down on Seventh street, not in New York."

A very large and unusual business was done during May and June, 1920, and B. B. Kaufmann, as president, had direct charge of the store during these months, until he went to Europe on June 19th. Mr. Alfred W. Kaufmann dictated and signed a large number of letters in executing the scheme, and was the buyer for the company in 1919 and 1920. Louis Kaufmann dictated and sent out a number of letters in pursuance of the scheme. During the last four months, when the business of the company was the largest, Louis Kaufmann was one of the main ones in directing the business.

Nathan Kaufmann, with others, directed the packing and reshipping of the merchandise when it came in. After B. B. Kaufmann went to Europe on June 19, 1920, "and during his absence, Mr. Nathan Kaufmann, Mr. Louis Kaufmann, and Mr. Al. Kaufmann (Mr. Alfred W. Kaufmann) had charge of the store there." Meyer Gordon was connected with the execution of the scheme. His firm name, Kaufmann & Gordon (Nathan Kaufmann and Meyer Gordon), appeared as indorser on the B. B. Kaufmann Company's checks to the extent of $9,000, which seems to have been diverted from corporate accounts. Scott and others "packed and shipped those goods under the direction of Nathan Kaufmann, Al. Kaufmann, Mr. Louis Kaufmann, and Mr. Gordon," and "occasionally Louis Kaufmann and Nathan Kaufmann and Meyer Gordon helped pack." One morning, as above stated, after knocking at the door of the store and waiting five to ten minutes before it was opened and Scott admitted, he found Meyer Gordon, with others, there.

On a review of the whole record, we are of opinion that the evidence is sufficient to justify the conclusion of the jury that all the plaintiffs in error took part in devising or executing the scheme.

[6] Counsel cites three instances in which the trial court erred in admitting testimony over objection. The first one relates to the testimony of the receiver that certain persons and firms paid him as receiver upward of $5,000, which represented the difference between cost price and the price below cost at which the defendants sold merchandise to them. It should be observed that part of this testimony was admitted without objection, and the harm, if any, was already done before objection was made. The indictment charges that part of the scheme devised was that, after the defendants had established the credit of the B. B. Kaufmann Company, so that it could secure on credit large quantities of merchandise, they would dispose of it to their friends and others, and thus convert it into cash, regardless of the amount paid for it, and in this manner "dissipate the assets and property of the said B. B. Kaufmann Company, * * * and convert the same to their own use, benefit, and advantage, without returning to the persons to be defrauded anything of value therefor." The truth of this charge, being denied by defendants, constituted an issue to be deter-

mined at the trial, and it seems to us that testimony of these returns, voluntarily made, without threat of any kind, of the difference between cost and the price at which the merchandise was sold, was both relevant and material.

In support of his position counsel cited Gould et al. v. United States. 209 Fed. 730, 126 C. C. A. 454, decided by the Eighth Circuit Court of Appeals, which held that it was error to admit, over objection, from the state court a certified copy of complaint, judgment, execution, and return thereon in the case of George S. Clayson, doing business as the Clayson Map Company, v. Riverside Land & Irrigation Company, a corporation. This judgment was rendered upon default, and there was "no recital in the judgment that any service of process was ever had on the defendant, and nothing appears in the exhibit to show that the court had any jurisdiction over the defendant to render the judgment which it did." Two persons by the name of Wright and White, who, with Gould, were being tried for violation of section 215 of the federal Penal Code, ordered certain maps, which embodied the alleged false representation, made by defendants, from the plaintiff company, and the suit was for the balance due on them. The defendants were connected with the irrigation company which circulated the maps. Counsel did not state the purpose for which the exhibit was offered, but said in his brief that the purpose was evident. The Circuit Court of Appeals said:

"We regret, if the purpose of admission of this exhibit was evident to counsel, that he did not think it best to inform us of that purpose, for we are involved in some doubt upon the subject."

The court held that the insolvency of the defendant company was regarded by the District Court as a material factor in determining whether or not the defendants intended to defraud, and that if the record was admitted to establish that fact it was wholly inadmissible. The testimony in the instant case was very different, was admitted for an entirely different purpose, under different facts, and so that case is inapplicable.

He also cited Faulkner v. United States, 157 Fed. 840, 85 C. C. A. 204, which holds that the failure of one, who makes substantially true advertisements of his business, to make settlement with some of his creditors, does not make it a question to be submitted to the jury. The mere statement of the proposition shows that it is so different from the one here involved that it can have no bearing upon the question raised.

[7] Counsel further assigns as error the admission of the Government's Exhibit No. 30, a carbon copy of a letter addressed to the Credit Clearing House of Indianapolis, Ind., because it was not the best evidence. What this exhibit contained, we do not know. Here is what the record shows:

"Exhibit No. 30.

"Have no way of knowing what Exhibit No. 30 is, and could not locate the same among the exhibits."

Whether or not the admission was prejudicial we have no way of determining, and therefore this assignment is not ground for reversal.

[8] Counsel also assigned as error the admission of Exhibit No. 14, a letter of the Kaufmann Company containing a financial statement. The record states as to this exhibit:

"Exhibit No. 14.

"Government Exhibit No. 14 is a letter to Stein & Co., dated February 11, 1920, and inclosing a financial statement. Unable to locate."

It is charged that the scheme devised by defendants was carried out by the use of the mails. If they mailed a letter containing misleading financial statements for the purpose of securing credit, we do not see why the letter would not be material and evidential. In any event, if the admission of the exhibit was not prejudicial, it is not ground for reversal. Lancaster v. Collins, 115 U. S. 222, 6 Sup. Ct. 33, 29 L. Ed. 373; Lazarus v. Phelps, 156 U. S. 202, 206, 15 Sup. Ct. 271, 39 L. Ed. 397. We are aware that, when the application of this rule is made, it must clearly appear that the error did not prejudice the party's rights. Deery v. Cray, 72 U. S. 795, 808, 18 L. Ed. 653. Not having either of the exhibits, or copies of them, we cannot determine whether or not they were prejudicial, and in the absence of evidence we cannot speculate what possible effect they might have had upon the jury.

[9] The judge's refusal to charge as requested relates to a request on specific intent and good reputation. He was asked to charge that, before the jury could convict any of the defendants, it must be satisfied beyond a reasonable doubt that, before ordering the goods purchased, they had already formed a plan to convert them to their own use, and not pay for them, with intent to cheat and defraud the persons furnishing them. This request, as drawn and presented, could not have been granted, for the reason that the scheme especially contemplated and set out the fact that part of the merchandise ordered was to be paid for in order to establish a line of credit, and, when this had been done, other goods ordered were not to be paid for. The request did not recognize that part of the merchandise ordered was, and part was not, to be paid for. The point included all merchandise without distinction, and an affirmance would have nullified an essential part of the scheme devised. Intent is the gist of the offense, and without an intention to defraud, it matters not how visionary and illusory the scheme is, there is no crime under this statute. McDonald v. United States, 241 Fed. 793, 798, 154 C. C. A. 495; Durland v. United States, supra. If the request had been limited to intent not to pay for merchandise ordered after a line of credit had been established, it should have been charged, unless it had been sufficiently covered in the general charge. Hendrey v. United States, 233 Fed. 5, 18, 147 C. C. A. 75.

The learned trial judge did not specifically charge as requested on intent, but he did substantially do so in his general charge, so that there was no misunderstanding by the jury. He defined "artifice" as some trick, method, or mode, contrary to the usual acts of man, to defraud, and that a scheme to defraud had practically the same meaning. The device of a scheme or artifice to defraud is equivalent to the de-

vice of a scheme with the intent to defraud. The device of a scheme to defraud is the formation of a purpose, of an intention, and the statement of a device to defraud is the declaration, in other language, of an intention to defraud. The judge defined the scheme, set out in the indictment, namely, that the defendants would order merchandise and pay for it for the purpose of establishing a line of credit, and when established they would then order large quantities of merchandise which was not to, be paid for, but to be converted to their own use, as the first element of the crime which was completed by the use of the mails. The charge as a whole clearly shows that this scheme to defraud was devised before any order for merchandise was given. It is evident that the jury was not misled, and the request should have been denied.

[10] The second refusal to charge relates to good reputation. The court charged that:

"Now, facts may create, and it is only the facts that can create, a reasonable doubt. It is not evidence alone, unless you believe the evidence and reach the fact that that evidence is introduced to prove. The defendants have put their character in issue. You have heard the witnesses as to the good character of the defendants. Now, of course, if you believe the testimony of those witnesses, then you find as a fact that the defendants had a good reputation; but that fact is like any other fact in the case which may create a reasonable doubt. The evidence doesn't create the reasonable doubt unless you believe it; but if you believe the fact, then it may tend to create a reasonable doubt, or may not, just as any other fact in the case might, after you have determined what it is."

Counsel objected to this part of the charge, and requested the learned trial judge to charge "that standing alone, of itself, that it [good reputation] may create such a doubt," which he refused to do. Error was assigned, and the cases of Edgington v. United States, 164 U. S. 361, 366, 17 Sup. Ct. 72, 41 L. Ed. 467, and Snitkin v. United States (C. C. A.) 265 Fed. 489, were cited in support of his position. In the Snitkin Case the trial judge erred, in that he did not furnish the jury with the "legal scales in which to weigh reputation for good character." The defendant had the right to have the jury know the weight to give to it, but the charge was entirely silent on this important testimony, and the judgment was accordingly reversed. In the Edgington Case the lower court held that good reputation was to be disregarded, unless the consideration of the other evidence left the jury in doubt, and, if it did, then the defendant's reputation for good character should be considered. The Supreme Court held this to be erroneous, and said that:

"Good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing."

Good reputation is the result of right thinking as reflected in right living, in a course of honest dealing and honorable conduct. This is, and should be, an important factor to be considered in determining the guilt or innocence of a person accused of crime. Every defendant is entitled to have his reputation for good character placed upon the

scales in his behalf. When considered in connection with the other evidence in a case, it may be sufficient to create a reasonable doubt. The circumstances, established by the evidence, may be such that without good reputation the jury would have no doubt of the defendant's guilt, but, weighed in connection with the other circumstances, which the jury must take into account, it may be the one element which turns the scales in the defendant's favor and creates reasonable doubt. In no case, which has been called to our attention and which our independent investigation has brought to light, has evidence of good reputation alone, without regard to the other evidence and circumstances of the case, been held sufficient to create reasonable doubt.

Upon authority, therefore, we conclude that the defendant was not entitled to have the judge charge that his good reputation, standing alone, of itself, without regard to the other evidence or circumstances in the case, was sufficient to create reasonable doubt. Baker v. State, 53 N. J. Law, 45, 20 Atl. 858; People v. Conrow, 200 N. Y. 356, 93 N. E. 943; Edgington v. United States, supra. This conclusion seems sound in principle. If the converse were true, all that a defendant would have to do would be to submit testimony of reputation for good character, and request the trial judge to charge that it alone was sufficient to create a reasonable doubt, and if his reputation was sufficiently good the jury could not legally convict him.

[11] In defining conspiracy, the judge said to the jury: "Conspirators need not make any agreement with each other at all." This is assigned as error. What the judge said in that connection was:

"Now, a conspiracy is an offense where there is concerted action by more than one person to do an illegal act, or, perhaps, to do a legal act in an illegal way. Conspirators do not meet in public and enter into agreements in the presence of people as a rule. I do not know that we ever see conspirators do that, unless in some representation on the theatrical stage. Conspirators need not make any agreement with each other at all. We judge of a conspiracy by the acts of the parties to that conspiracy and the results of those acts, quite largely. If, for instance, people are found working together for an unlawful end to be accomplished, and accomplish it, we may properly determine that there was a conspiracy among them to accomplish that unlawful thing. And if we find them working together to do in an unlawful way something that may even reach a lawful end, we would, perhaps, conclude that there was a conspiracy between them."

The sentence to which objection is made must be interpreted in connection with its context, which shows that the judge meant that conspirators need not directly make by words or in writing any formal agreement, but that if they were working together, in concerted action, for an unlawful end, the jury might conclude that there was a conspiracy—a mutual, tacit understanding between them to commit an offense. United States v. Cassidy (D. C.) 67 Fed. 698; Patnode v. Westenhaver, 114 Wis. 460, 474, 90 N. W. 467; Pittibone v. United States, 148 U. S. 197, 203, 13 Sup. Ct. 542, 37 L. Ed. 419.

We do not find reversible error in this case, and the judgment of the District Court is affirmed.